BROOKHAVEN CABLE TV INC. et al., Plaintiffs,

United States of America and Federal Communications Commission, Intervenors-Plaintiffs,

v.

Robert F. KELLY, Chairman, et al., Defendants,

National Association of Regulatory Utility Commissioners, Intervenor-Defendant,

City of New York, Amicus Curiae.

No. 76–CV–154.

United States District Court, N. D. New York.

March 9, 1977.

Dugan, Lyons, Pentak, Brown & Tobin, Albany, N.Y. and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Stuart Robinowitz, New York City, of counsel.

Rex E. Lee, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Paul V. French, U.S. Atty., N.D.N.Y., Albany, N.Y., for intervenors-plaintiffs; David J. Anderson, Robert M. Rader, Washington, D.C., Gustave J. DiBianco, Asst. U.S. Atty., Syracuse, N.Y., of counsel.

Louis J. Lefkowitz, Atty. Gen., Albany, N.Y., for defendants; Kenneth J. Connolly, Asst. Atty. Gen., of counsel.

Paul Rogers, Stephen G. Kraskin, Washington, D.C., for intervenor-defendant.

W. Bernard Richland, Corp. Counsel, New York City, for amicus curiae; Alexander Gigante, Jr., Evelyn J. Junge, New York City, of counsel.

### MEMORANDUM–DECISION AND ORDER

PORT, Senior District Judge.

The plaintiffs and defendants have both moved for summary judgment on the first claim for relief asserted in the complaint. That claim challenges the right of the defendants, Commissioners of the New York State Commission on Cable Television (State Commission), to regulate the charges for pay cable TV on the ground that the matter has been preempted by the Federal Communications Commission.

The United States and the Federal Communications Commission were granted leave to intervene as parties plaintiff. The National Association of Regulatory Utility Commissioners was granted leave to intervene as a party defendant. The intervenors have joined in the motions for summary judgment. The City of New York was granted leave to appear as amicus curiae in support of the defendants' motions.

### The Parties

Five of the original plaintiffs (Brookhaven, Capitol, Samson, Teleprompter and Warner) are corporations which operate ca-

ble television systems in New York State. National Cable Television Association, Inc. (NCTA) and New York State Cable Television Association (NYCTA) are, respectively, national and state trade associations of cable television systems. The remaining plaintiff, Home Box Office (HBO), is an enterprise which supplies pay cable programming to cable television systems both in New York and in other states. Plaintiff intervenors are the United States and the Federal Communications Commission (FCC).

The defendants are the five members of the New York State Commission on Cable Television. *See N.Y. Exec. Law* § 814 (McKinney Supp. 1975). Defendant intervenor, the National Association of Regulatory Utility Commissioners (NARUC), is a quasi-governmental, nonprofit organization whose membership includes governmental and regulatory bodies throughout the United States.[1]

### Cable and Pay Cable TV

Cable TV essentially operates by retransmitting television signals to home viewers by cable, rather than by over-the-air broadcasting. When it originated, cable TV performed two basic functions. It enhanced reception of local television broadcasts, and it also permitted the importation of signals from distant television stations beyond the range of local reception.[2] Today, however, cable TV systems may also originate their own programming, which is called "cablecasting",[3] or may make available certain "access channels" over which individuals may transmit programming to home view-

ers.[4] Generally, cable TV systems provide these services to their subscribers for a basic monthly fee.[5]

Pay cable TV augments the basic cable service by providing the home viewer with additional programming for an additional monthly or other charge. The most common pay cable system provides the viewer with an additional channel for a flat monthly fee over the basic cable TV charge. The plaintiffs employ such a system. HBO supplies box-office type programming to local cable TV systems. This programming includes recent motion pictures, sports events not otherwise televised, and other entertainment, all shown without commercial interruption.[6] The local cable TV system then distributes this programming to pay cable home viewers over a channel which is accessible only to the pay cable subscribers. In order to receive HBO, the subscribers must pay a monthly fee in addition to the charge for their basic cable TV service.

Other pay cable systems are also being developed. Some systems provide the viewer with different programming options, e. g., sports programs or recent films, at different prices. Some systems charge the viewer only for those programs actually watched.[7]

### The FCC's Actions

By 1965, the FCC was involved in regulating the growing cable TV industry.[8] The agency's jurisdiction over this developing medium was first upheld by the Supreme Court in 1968.[9] In 1969, in an effort to encourage diversity of programming on cable TV, the FCC promulgated rules requir-

---

1. The City of New York, appearing as *amicus curiae,* has briefed the court in support of the defendants' position that the FCC lacks jurisdiction to preempt pay cable TV.

2. *See United States v. Southwestern Cable Co.,* 392 U.S. 157, 163, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

3. *See United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972).

4. *See American Civil Liberties Union v. FCC,* 523 F.2d 1344 (9th Cir. 1975).

5. *See* Affidavit of Gerald M. Levin, ¶ 2 (dated April 29, 1976).

6. *Id.* ¶¶ 3–5.

7. *See* Affidavit of James R. Hobson, ¶ 3 (dated June 4, 1976).

8. *See Id.* ¶ 7.

9. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

ing cable TV systems having over a minimum number of subscribers to originate their own programming through cablecasting.[10] The Commission envisioned that some of this cablecasting would occur over leased access channels.[11] These are channels made available by the cable TV system, for a fee, to a third party who provides programming for home viewers. The FCC announced in 1971 that it had preempted the field of pay cable television cablecasting,[12] even though no comprehensive review of pay cable had yet been undertaken.

Having developed a policy of dual jurisdiction over cable TV rate regulation, the FCC in 1972 decided to permit local regulation of the rates for basic cable TV services only.[13] These are the services which the cable system regularly supplies to all subscribers. However, because the FCC wanted to encourage experimentation in the new medium of pay cable TV, and because it feared that both federal and local regulation would be confusing and impracticable, the Commission at that time precluded local rate regulation for pay cable TV.[14] The FCC's position and its reasoning were stated much more clearly in a subsequent clarification in 1974.

It remains our intent to keep [leased access] channels as free as possible from any regulation that might restrict or artificially alter their growth. This is particularly true in the area of rate regulation. We have pre-empted this area with the explicit purpose of allowing the market place to function freely.

. . . . .

We have intentionally and specifically limited rate regulation responsibilities to the area of regular subscriber service, and we will continue to do so. We have defined "regular subscriber service" as that service regularly provided to all subscribers. This would include all broadcast signal carriage and all our required access channels including origination programming. It does not include specialized programming for which a per-program or per-channel charge is made. The purpose of this rule was to clearly focus the regulatory responsibility for regular subscriber rates. It was not meant to promote rate regulation of any other kind.

85. After considerable study of the emerging cable industry and its prospects for introducing new and innovative communications services, we have concluded that, at this time, there should be no regulation of rates for such services at all by any governmental level. Attempting to impose rate regulation on specialized services that have not yet developed would not only be premature but would in all likelihood have a chilling effect on the anticipated development. This is precisely what we are trying to avoid.[15]

Noting that conventional TV's dependence on advertising and its limited broadcast spectrum confined its programming to mass appeal, the FCC in 1975 further explicated the need for its policy.

Since conventional television often cannot, because of its nature, cater to minority tastes and interests, we encourage the development of new technologies which promise viewing diversity. Subscription television promises to bring both diversity of programming and diversity of format to those who are willing to pay a direct

---

**10.** *See* First Report and Order in Docket No. 18397, 20 F.C.C.2d 201 (October 20, 1969). These regulations were subsequently upheld by the Supreme Court in *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972).

**11.** *See* First Report and Order in Docket No. 18397, 20 F.C.C.2d 201, 214 (October 24, 1969).

**12.** "[T]he Commission has pre-empted the field of pay television cablecasting so that local franchise terms are inoperative and no further affirmative authorization is required." Request

by Time-Life Broadcast, Inc., 31 F.C.C.2d 747 (September 8, 1971).

**13.** Cable Television Report and Order, Docket Nos. 18397 et al., 36 F.C.C.2d 143, 209 (February 3, 1972).

**14.** *Id.* at 193.

**15.** Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry, 46 F.C.C.2d 175, 185, 199–200 (April 17, 1974).

charge for the service. Neither STV nor cable television must attract advertiser support with programming having a broad mass appeal. Cable television, with its abundant channel capacity, is particularly able to program for audiences with specialized interests. Subscription television's potential to expand the public's program choices, to supplement the programming now provided by conventional television, gives it an important role to play in our national communications structure.[16]

Once again, in the spring of 1976, the FCC emphasized its position. "[T]he Commission has not only declined to regulate the rates for these services [including pay cable] but has preempted their regulation by state and local authorities." [17]

### The State's Actions

In 1972, the New York State Commission on Cable Television (State Commission) was created. *N.Y. Exec. Law* §§ 811–31 (McKinney Supp. 1975). The State Commission was given rather broad powers to regulate cable TV within New York, *see e.g., Id.* §§ 816, 824, including the power to regulate the rates charged by cable TV systems. *Id.* §§ 822, 825. Nowhere within the State Commission's enabling legislation is any distinction drawn between basic cable TV service and pay cable TV. The state statutes require that rates charged by a cable TV company be specified in the company's franchise, *Id.* § 825(1), and that rates not be changed except by amendment of the franchise. *Id.* § 825(2). Furthermore, any franchise amendment requires the approval of the State Commission. *Id.* § 822(1). Thus, any change in the rates charged for cable TV service requires the State Commission's approval.

In March of 1976, the State Commission issued a Clarification of Commission Policy, Rates Charged by Cable Television Companies for "Auxiliary" Programming, Docket No. 90010 (March 1, 1976) (Clarification).[18] In its Clarification, the State Commission asserted its authority to regulate the rates charged for pay cable TV. It disputed the FCC's jurisdiction over such regulation and further disputed the FCC's contention that pay cable rate regulation had, in fact, been federally preempted. The State Commission expressed concern that, due to the FCC's position, many New York cable TV companies were not complying with the requirements of the New York Executive Law. In particular, they were allegedly refusing to file their rates for pay cable TV, although they did so for basic cable TV. Many companies supposedly instituted HBO service without specifying the rates charged in their franchise. The State Commission also claimed that various abuses were occurring concerning the fees charged for pay cable TV.[19]

The Clarification concluded with a specific ruling that pay cable TV services were not exempt from the requirements of Section 825 of the Executive Law. In lieu of formal amendment of their charters "at this time", the State Commission required all cable TV companies providing pay cable services to file a notice of the nature of their pay cable services along with the rates charged, or else face appropriate sanction. Finally, the State Commission states that active enforcement of all these policies will be undertaken.

Plaintiffs then commenced this action, claiming that the State's Clarification violates orders of the FCC in an area specifically preempted by the FCC. Plaintiffs request a judgment declaring the State's

---

**16.** First Report and Order in Docket Nos. 19554 and 18893, 52 F.C.C.2d 1, 43 (April 4, 1975).

**17.** Notice of Inquiry in Docket No. 20767, F.C.C. 76–314, —— F.C.C.2d —— (April 2, 1976) at 2.

**18.** The Clarification has been attached to the state defendants' motion papers. Affidavit of

Kenneth J. Connolly, Exh. 1 (dated May 5, 1976).

**19.** For example, the State Commission alleges that some companies, when refused rate increases for basic cable TV services, have unilaterally raised their pay cable TV fees.

attempt to regulate pay cable TV void and enjoining such regulation.[20]

### Contentions

The plaintiffs simply contend that the State Commission's Clarification constitutes price regulation of pay cable TV which has been prohibited and preempted by the FCC.

Defendants take the position that the State Commission's action does not attempt to regulate the charges for pay cable, that the FCC's action does not effect preemption, and the FCC lacks jurisdiction to preempt.

In addition, the defendants seek judgment in their favor because of an asserted lack of a case or controversy, because of mootness, and plaintiffs' lack of standing.

Because these last claims are without substance, and because the FCC has the power and has preempted the right to control pay cable charges, judgment should be granted in favor of the plaintiffs.

### Issue

■ The real issue simmers down to: Whether jurisdiction over pay cable rates is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting"? *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968).

### Power to Regulate Cable TV

The FCC's authority to regulate cable TV has been upheld by the Supreme Court on two occasions. The first case arose out of an agency rule which forbade a cable TV system from importing distant television signals into any of the nation's 100 largest television markets. Southwestern Cable Company sought to bring distant (Los Angeles) signals to its cable subscribers in San Diego, one of the 100 largest markets. At the request of a third party, the FCC ordered Southwestern to halt this proposed expansion of its services. The Supreme Court upheld the Commission's authority. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). The Court found this authority in the general language and purpose of the Federal Communications Act. 47 U.S.C. §§ 151, 152(a). However, without specifically detailing the limits of the FCC's power, the Court noted that such authority is "restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968).

Four years later, the Court further illuminated the contours of its "reasonably ancillary" test. The FCC had promulgated rules requiring cable systems with a certain minimum number of subscribers to originate some programs. A cable system subject to the new rules challenged the FCC's authority to issue them, and the agency's power was again upheld. *United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). The Court's inquiry focused on whether the program-origination rules were "reasonably ancillary" to the performance of the FCC's responsibilities for regulating TV broadcasting. *Id.* at 663, 92 S.Ct. 1860. Holding in the affirmative, the Court noted that "the Commission's legitimate concern in the regulation of CATV [cable TV] is not limited to controlling the competitive impact CATV may have on broadcast services . . . but extends also to requiring CATV affirmatively to further statutory policies." *Id.* at

---

**20.** Plaintiffs' complaint alleges federal jurisdiction under a variety of statutes: 28 U.S.C. §§ 1331, 1337, 1343(3), 2201; 47 U.S.C. § 401(b). It seems abundantly clear that this suit arises under the Federal Communications Act, 47 U.S.C. § 151 et seq. Jurisdiction is, therefore, based on 28 U.S.C. § 1337. *See Post v. Payton,* 323 F.Supp. 799 (E.D.N.Y.1971). The per se interstate nature of cable TV has been noted elsewhere. *National Association of Regulatory Utility Commissioners v. FCC,* 174 U.S.App.D.C. 374, 533 F.2d 601, 621 (1976)

664, 92 S.Ct. at 1869.[21] The Court also stated that, merely because the cablecasts would be transmitted without use of the broadcast spectrum, the regulation was no less ancillary to the FCC's jurisdiction over broadcast services. *Id.* at 669, 92 S.Ct. 1860. Emphasis was placed on the rule's effect of providing home viewers with "suitably diversified programming." *Id.* With the distinction between protection and promotion and that between broadcasting and cablecasting set aside, the Court's inquiry became much simpler.

> [T]he critical question in this case is whether the Commission has reasonably determined that its origination rule will "further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services . . ." (citation omitted) We find that it has.

*Id.* at 667–68, 92 S.Ct. at 1870.

### Reasonably Ancillary?

The FCC has found that pay cable TV increases programming diversity,[22] an objective which has specifically been held to be reasonably ancillary to the FCC's responsibilities over broadcasting. *United States v. Midwest Video Corp., supra,* 406 U.S. at 667–68, 92 S.Ct. 1860, 32 L.Ed.2d 390. Pay cable TV's capability to satisfy minority tastes which are ordinarily overlooked by conventional television[23] enhances and fortifies this objective.

In furtherance of program diversification and applying the "reasonably ancillary"

test, the Ninth Circuit has upheld the FCC's power to regulate access channels, including leased access channels. *American Civil Liberties Union v. FCC,* 523 F.2d 1344 (9th Cir. 1975).

Defendants rely heavily on *National Association of Regulatory Utility Commissioners v. FCC,* 174 U.S.App.D.C. 374, 533 F.2d 601 (1976) (NARUC), which limited the FCC's reasonably ancillary powers. *NARUC* held that the FCC could not preempt state regulation of the use of cable TV leased access channels for two-way non-video communications such as surveys and burglar alarms.[24] The *NARUC* court reached its result in spite of defining "ancillary to broadcasting" broadly.

> *Midwest,* without question, takes a giant step beyond *Southwestern,* in relaxing the nature of the ancillariness necessary to support an assertion of Commission power over cable. As we read the case, it turns upon a determination that "ancillary to broadcasting" means not only "for the protection of broadcasting," but also embodies any regulation of cable which in its own right serves the purposes pursued by broadcast regulation. Since a prime purpose in the area of broadcast regulation is the assurance of variety in what appears on the home viewer's screen, the Court concluded that an origination requirement aimed at providing "suitably diversified programming," is within the ancillariness standard.

*Id.* at 615 (footnotes omitted). *NARUC* concluded that non-video return signals[25] from the viewer to the cable TV system had no relation to the FCC's power over broadcasting. These signals were private in na-

---

(Lumbard, J., concurring). There is no need to consider the other alleged jurisdictional grounds.

**21.** In short, the regulatory authority asserted by the Commission in 1966 and generally sustained by this Court in *Southwestern* was authority to regulate CATV with a view not merely to protect but to promote the objectives for which the Commission had been assigned jurisdiction over broadcasting.
*United States v. Midwest Video Corp.,* 406 U.S. 649, 667, 92 S.Ct. 1860, 1870 (1972).

**22.** *See* note 16 and accompanying text *supra.*

**23.** *Id.*

**24.** *National Association of Regulatory Utility Commissioners v. FCC,* 174 U.S.App.D.C. 374, 533 F.2d 601, 610 n. 44 (1976) (NARUC).

**25.** The court specifically limited its consideration to "non-video return transmissions", and did not consider return video signals because of the latter's present economic and technological unfeasibility. NARUC, *supra,* at 605 n. 1.

ture and, in fact, had nothing to do with broadcasting. The court contrasted cable programs which, to the home viewer, are indistinguishable from broadcasts, even though they are transmitted by cable and not over the air. *Id.* at 615–16. Although *NARUC* did limit the FCC's powers, that limit was placed well beyond the FCC's present attempts to regulate pay cable TV.[26]

The nexus between broadcasting purposes and "leased access channels for two-way, point-to-point, non-video communications"[27] which was found to be so patently missing in *NARUC* is obviously present in pay cable TV.

The FCC has determined that rates for pay cable TV should be set by marketplace forces and not regulated by state or local authorities. The rationale behind this decision is simply that rate regulation can be expected to chill development of the new medium, whereas a free market environment should enable it to grow. Since the FCC has also determined that pay cable TV will increase programming diversity, it follows that efforts to nurture and protect this infant medium will, likewise, result in an increase in programming variety. This same rationale supported an earlier decision of the FCC to preclude rate regulation of another infant medium, subscription television (STV).[28] *National Association of Theatre Owners v. FCC,* 136 U.S.App.D.C. 352, 420 F.2d 194 (D.C.Cir.1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970) (NATO). *NATO* upheld the FCC's jurisdiction over rate regulation for STV. More recently, the Ninth Circuit has affirmed the FCC's jurisdiction to regulate the rates for cable TV access channels, including those for leased access channels. *American Civil Liberties Union v. FCC,* 523 F.2d 1344 (9th Cir. 1975).

Defendants argue that rate regulation of pay cable TV transcends the limits of the FCC's "ancillary" jurisdiction. In *Midwest Video,* the Supreme Court upheld the FCC's cablecasting requirements by a 5–4 vote, with Chief Justice Burger casting the deciding vote. In his concurring opinion, the Chief Justice stated his belief that "the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts." *United States v. Midwest Video Corp.,* 406 U.S. 649, 676, 92 S.Ct. 1860, 1874, 32 L.Ed.2d 390 (1972) (Burger, C. J., concurring). Relying on the language of the Chief Justice, defendants argue that the present attempt to rate regulate pay cable TV exceeds these "outer limits". However, if a cable TV system can be "drafted against [its] will to become a broadcaster" 406 U.S. at 680, 92 S.Ct. at 1876 (Douglas, J., dissenting), and still be within the "outer limits", it is hard to see how permitting free play in the great variety of pay TV programs can be outside those limits.

*Head v. New Mexico Board of Examiners,* 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) and *TV Pix, Inc. v. Taylor,* 304 F.Supp. 459 (D.Nev.1968), *aff'd,* 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970), cited by defendants are inapposite. On an analysis of the facts in those cases, the Court merely found that the Commission had not, in fact, exercised its power to preempt. In this case, the preemption or, as stated by the defendants' clarification, the "purported preemption of the field", is virtually conceded. The defendants, however, "fail to agree with the legality of the FCC's preemptive policy".

The state defendants argue that their actions are merely concerned with franchising. Since the power to franchise is a state

**26.** Judge Wilkey's opinion for the court ruled on an alternative ground—that these systems were really carriers and, because they were intrastate as well, they were specifically excluded from the FCC's purview by 47 U.S.C. § 152(b). However, NARUC was decided by a 2–1 vote, with Judge Lumbard of the Second Circuit concurring, and Judge Skelly Wright

dissenting. Judge Lumbard's opinion deals only with the "reasonably ancillary" question and does not reach the issue raised by 47 U.S.C. § 152(b).

**27.** NARUC, *supra,* at 605.

**28.** STV is pay over-the-air television.

power, delegable to localities, the FCC allegedly cannot preempt this area.[29] Defendants have overstated their case. The FCC has developed a policy of dual jurisdiction over cable TV, with responsibilities divided between the Commission and state and local governments. *See National Cable Television Association v. United States,* 415 U.S. 336, 339, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). Specifically, the FCC has concluded that local franchising of cable TV systems is preferable to a scheme of federal licensing.[30] Also, rate regulation of basic cable TV services has been delegated to the states.[31] On the other hand, the FCC has consistently precluded local rate regulation of pay cable TV.[32] The state defendants' present actions go beyond mere franchising; they attempt to regulate the rates charged for pay cable TV in clear conflict with federal policy. Although defendants argue that their actions are authorized by their enabling legislation, *N.Y. Exec. Law* §§ 811–31 (McKinney Supp.1975), this very statute contradicts their assertion of authority independent of the FCC. One of the enumerated legislative findings therein is a need "to promote the rapid development of the cable television industry responsive to community and public interest and *consonant with policies, regulations and statutes of the federal government* . . . ." *Id.* § 811 (emphasis added).

**29.** In support of this assertion, the state defendants cite two old Supreme Court cases. *Russell v. Sebastian,* 233 U.S. 195, 34 S.Ct. 517, 58 L.Ed. 912 (1914); *City of Owensboro v. Cumberland Telephone & Telegraph Co.,* 230 U.S. 58, 33 S.Ct. 988, 57 L.Ed. 1389 (1913). However, neither of these cases deal with federal preemption nor do they involve problems of conflicting state and federal powers. They concern the protection of property rights acquired by utility companies prior to the development of franchising systems.

**30.** Commission Proposals for Regulation of Cable Television, 31 F.C.C.2d 115, 136 (August 5, 1971); *see* 47 C.F.R. § 76.31 (1975).

**31.** *See* notes 13 to 15 and accompanying text, *supra.*

**32.** Notice of Inquiry in Docket No. 20767, FCC 76–314, —— F.C.C.2d —— (April 2, 1976); First Report and Order in Docket Nos. 19554 and

*Ripeness, Mootness, Standing*

The defendants' claims of ripeness, mootness and standing can be disposed of with little discussion.

 The defendants' Clarification [33] of Commission policy makes it abundantly clear that it is the Commission's policy to require cable TV companies in New York to specify in the franchise the rates for "auxiliary programming" as well as "rates for . . . regular subscriber services". The Clarification further recognizes the "growing popularity of the 'home box office' programming service". The Clarification then acknowledges that cable TV services have failed to file the rates for cable pay TV, a practice which was "attributable to the Federal Communications Commission's position that state and local governments may not involve themselves in the regulation of subscriber rates for cable television services other than those described above as 'regular' or 'basic'." [34] The Clarification then goes on to state that, because the preemption policy of the Commission has not been tested in a court, it will insist on the filing as required under its Clarification. Thus, although inviting a court test, it now, given the opportunity, seeks to avoid it.[35] For noncompliance, it threatens enforcement. In short, it prefers the threat to the test.

Although it has not required the plaintiffs presently supplying pay cable TV ser-

18893, 52 F.C.C.2d 1 (April 4, 1975); Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry, 46 F.C.C.2d 175 (April 17, 1974); Cable Television Report and Order, Docket Nos. 18397, et al., 36 F.C.C.2d 143 (February 3, 1972); Request by Time-Life Broadcast, Inc., 31 F.C.C.2d 747 (September 8, 1971).

**33.** *See* note 18 *supra.*

**34.** *Id.*

**35.** It should be noted that New York could have contested the FCC's preemption of pay cable TV rate regulation without forcing plaintiffs to bring this suit. The FCC's decision was reviewable in the Courts of Appeals pursuant to 28 U.S.C. § 2342.

vice to amend their charter, "at this time", no assurance is given of when such amendment might be required. The necessary long term and substantial commitments required for the development of pay cable TV are not likely to be undertaken while "waiting for the other shoe to drop".

Under these circumstances, the test for ripeness is met. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

*Abbott Laboratories, supra,* established a two-part test for determining the ripeness of an action. The test requires the district courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The factors which led the Court to find that case fit for judicial decision are all present here. First, this action involves purely legal questions, essentially whether the FCC has jurisdiction to preempt pay cable TV rate regulation. Secondly, the Clarification issued by the State Commission possesses the requisite finality. It is not an informal statement, nor is it the ruling of a subordinate administrative officer. Rather, it is a ruling by the five-member state commission which has jurisdiction to regulate cable TV in New York. Finally, the Clarification is effective upon publication. It demands compliance within two months, threatens sanctions, and promises active enforcement of its rulings.

The second prong of the ripeness test considers the harm caused to the plaintiffs by withholding judicial review. In *Abbott Laboratories, supra,* plaintiffs were forced to comply or else to face civil and criminal sanctions. Here, although the threat of sanction is not as ominous, and the required filing not as onerous, the mere issuance of the Clarification has adversely affected all plaintiffs. Because cable TV is a capital intensive enterprise, cable systems which want to begin pay cable operations have been deterred from doing so by the threat of rate regulation.[36] Existing pay cable systems are deterred from expanding geographically.[37] Also, since the issuance of the Clarification, HBO has been severely hampered in its efforts to obtain new affiliates in New York State.[38] These facts are unlike those in *Daley v. Mathews*, 536 F.2d 519 (2d Cir. 1976), *cert. denied sub nom., Daley v. Califano,* —— U.S. ——, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977), where the Second Circuit recently affirmed a dismissal for want of ripeness. In contrast to the "tentative possibility of future inspection" *Id.* at 522, present in *Daley, supra,* the hardship to the plaintiffs herein is present and real.[39] The action is ripe for judicial review.

*Mootness*

■ Little need be said concerning defendants' claim of mootness as to four of the plaintiff TV systems which have filed with reference to pay cable TV. No claim is made that the case has been mooted as to the fifth cable TV plaintiff. In addition, the four filing plaintiffs filed under protest. The threat of having to amend their franchises and obtain the approval of the State Commission at any time subject to sanctions for failure is bound to affect adversely the stations filing under protest.[40] As indicated previously, making long range plans is impractical while "waiting for the other

36. *See* Affidavit of Stuart Feldstein, ¶ 2 (dated June 10, 1976). *See also* affidavit of James R. Hobson, ¶ 12 (dated June 4, 1976).

37. *See* Affidavit of Stuart Feldstein, ¶ 6 (dated June 10, 1976).

38. Affidavit of Bruce P. Sawyer, ¶ 4 (dated June 11, 1976).

39. Furthermore, the FCC has intervened as a party-plaintiff in this action. That agency,

which was created "to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service", 47 U.S.C. § 151, has a very real interest in preventing New York from regulating areas within the sphere of federal control.

40. *See Begins v. Philbrook*, 513 F.2d 19 (2d Cir. 1975).

shoe to drop". In addition, mootness is not raised as to the intervening plaintiffs.

### Standing

 Both NCTA and NYCTA, whose standing is attacked, clearly represent members adversely affected by the defendants' action. They, as well as HBO, whose pecuniary interest is clearly involved, have standing.[41]

For the reasons herein, the motion of the plaintiffs for summary judgment on the first claim in the complaint should be granted. The plaintiffs are to prepare a judgment to be agreed upon and submitted to me for signature. If the parties are unable to agree, judgment may be settled on three days notice.

SO ORDERED.

---

41. "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). *See also New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York*, 516 F.2d 350 (2d Cir. 1975). In fact, one of these plaintiff organizations, NCTA, has represented its members in similar federal litigation. *See, e. g., National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).