NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY, etc.,
Plaintiff, Appellee,

v.

PUBLIC UTILITIES COMMISSION OF
MAINE, et al., Defendants, Appellants.

No. 83–1779.

United States Court of Appeals,
First Circuit.

Argued March 6, 1984.

Decided June 29, 1984.

Rehearing Denied Sept. 10, 1984.

William E. Furber, Augusta, Me., with whom Charles F. Dingman, Cushing P. Samp, Joseph G. Donahue, Augusta, Me., Peter L. Murray, and Murray, Plumb & Murray, Portland, Me., were on brief, for defendants, appellants.

\* Of the District of Puerto Rico, sitting by designa-

Francis X. Bellotti, Atty. Gen., and Charles R. Peck, Asst. Atty. Gen., Com. of Mass., Utilities Div., Public Protection Bureau, Boston, Mass., on brief for the Atty. Gen., Com. of Mass., amicus curiae.

Robert A. Lewis, Boston, Mass., with whom Ralph I. Lancaster, Jr., Everett P. Ingalls, and Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., were on brief, for New England Tel. and Tel. Co.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and GIERBOLI-NI,\* District Judge.

BREYER, Circuit Judge.

In this case a private party seeks to enforce a decision of the Federal Communications Commission against a recalcitrant state utilities commission. The FCC promulgated a rule that required state public utility commissions to follow a certain method for calculating depreciation of telephone company equipment. The Public Utilities Commission of Maine (the "P.U.C.") evidently ignored the FCC rule. The private party, namely the New England Telephone Company, invoking the authority of section 401(b) of the Federal Communications Act, 47 U.S.C. § 401(b), obtained a federal district court injunction requiring the Maine commission to comply with the FCC rule. 570 F.Supp. 1558 (D.Me.1983). Section 401(b) of the Act states that if anyone

> fails or neglects to obey any order of the [Federal Communications] Commission ..., any party injured thereby ... may apply to the appropriate district court of the United States for the enforcement of such order.

We find that the word "order" in this statute does not include an FCC rulemaking decision of the sort here at issue. Thus, the district court lacked authority to issue the injunction.

tion.

## I

We start by examining the FCC decision at issue. The decision focused upon the question of how to recapture through depreciation charges the cost of a telephone company asset that has unexpectedly lost some of its anticipated economic value. (For a general description of cost recovery through regulated rate-setting, see *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d 1208 (1st Cir.1984).) To take an oversimplified, imaginary example to illustrate the problem, suppose that the telephone company originally thought that some connecting equipment (say, a $50 fuse) installed in 1960 on the line between a house and a street pole would last fifty years. The company might initially depreciate the equipment at the rate of $1 per year. Suppose further that in 1980, after the company has recaptured $20 through depreciation charges, a new, dirt cheap, technological development makes it sensible to replace the fuse in 1985, instead of in the year 2010. How should the company recapture the remaining $30 of its original equipment cost? One depreciation method, called the "whole life" method, would have the company recalculate the annual depreciation charge for future years by dividing the original $50 cost by the newly estimated whole life of the asset (25 years). Thus, for the next five years, the company would charge $2 per year. By 1985, the company, then, would have recovered $30 of its $50 investment; the remainder would be recovered after the fuse was taken out of service. Another method, called the "remaining life" method, would have the company recalculate the annual depreciation allowance by dividing the remaining undepreciated cost of the fuse ($30) by its remaining useful life. So, the company would charge $6 per year for the years 1981 through 1985, recovering the total cost by the time the fuse was retired from service.

The economic implications of the choice between these methods are likely to be complex and may be of great importance. *See generally* Cornell, Pelcovits, & Brenner, *A Legacy of Regulatory Failure*, Regulation, July/Aug. 1983, at 37; Fogarty, *Capital Recovery: A Crisis for Telephone Companies, A Dilemma for Regulators*, Pub.Util.Fort., Dec. 8, 1983, at 13. The "remaining life" method, for example, apparently means that consumers will have to pay more in the near future, but less in the more distant future. Moreover, there are those who argue that in the newly deregulated telephone world, the foreseeably long-term higher "phantom" depreciation charge resulting from the whole life approach (say, $2 extra per year from 1985 to 1995 to recover for the replaced fuse) could lead important customers to switch from the regular telephone system to other lower priced (but economically more costly) systems. If so, customer desertion could deprive the regular system of important sources of revenue and burden remaining customers with still higher charges.

Whether or not these concerns are accurate, the fact is that in 1980 the FCC announced that it would switch from "whole life" to "remaining life" depreciation methods. *In re Amendment of Part 31, etc.*, 83 FCC2d 267 (1980), *reconsidered*, 87 FCC2d 916 (1981). And in December 1982 it ruled that New England Telephone and certain other phone companies must use "remaining life" systems in setting their *inter*-state rates. *In re Prescription of Revised Percentages of Depreciation, etc.*, 92 FCC2d 920 (1982). It expressly said, however, that it would determine the applicability of its choice of methodologies to *intra*-state rates (the subject now before us) in a "separate proceeding." *Id.* at 928–29.

The "separate proceeding" was a rulemaking proceeding, which initially involved a different depreciation question, namely whether certain telephone assets should be depreciated or treated as current expenses. *In re Amendment of Part 31, Uniform System of Accounts, etc.*, Docket No. CC 79–105. The FCC concluded that some of the assets should be charged as current expenses, at least insofar as *inter* state rates were concerned. 85 FCC2d 818 (1981), *clarified as only affecting inter-state rates*, 89 FCC2d 1094 (1982). Several

phone companies then asked the FCC to reconsider whether it should not apply its rule to *intra*-state rates as well.

In the meantime, an Ohio telephone company asked the FCC for a "declaratory ruling" that the Commission's newly announced preference for a "remaining life" depreciation system applied to *intra*-state, as well as to *inter* state, rates and preempted contrary preferences of state regulatory commissions. The FCC evidently believed that the Ohio case and the *Part 31* case reconsideration both involved the same general question, whether the FCC should require state commissions to apply FCC depreciation policies in intra-state ratemaking. Hence, it consolidated the two proceedings.

In January 1983 the FCC announced its decision in the (now consolidated) *Part 31* reconsideration. 92 FCC2d 864 (1983). It held that its methods for calculating depreciation were automatically binding upon the state commissions under the Communications Act, 47 U.S.C. § 220(b). It added that, in any event, even if the federal Act did not *automatically* preempt the right of state commissions to follow different depreciation methods for intra-state transactions, the Commission could (and did) forbid their doing so, for a nationally uniform depreciation policy was of great importance to a sound national communications policy. The Maine P.U.C. was not a party to the *Part 31* reconsideration proceeding, but some other state regulatory commissions were, and several of these commissions have appealed the FCC's ruling to the Fourth Circuit, where the case awaits decision. *Virginia State Corporation Commission v. FCC*, 737 F.2d 388 (4th Cir.).

In April 1983, three months after the FCC's consolidated *Part 31* reconsideration decision, the Maine P.U.C. denied New England Telephone a rate increase in part because the increase rested upon the use of "remaining life" depreciation. The Maine commission decided that the FCC decision was unlawful—that the FCC could not tell it what depreciation methods to use. New England Telephone appealed the P.U.C.'s decision to the Maine Supreme Judicial Court, but it did not raise the "remaining life" issue in its appeal. Instead, it went to federal court, under 47 U.S.C. § 401(b), arguing that the Maine commission's defiance of the FCC was unlawful and should be enjoined. The federal district court agreed. The Maine P.U.C. now appeals its decision.

II

■ The FCC decision at issue is the product of a rulemaking proceeding, namely the *Part 31* reconsideration. *See* pages 8–9 *infra*. The decision also fits the Administrative Procedure Act's definition of a "rule": It is "an agency statement of general ... applicability and future effect designed to implement, interpret, or prescribe law or policy ..." 5 U.S.C. § 551(4). Hence, we consider it to be a rule. And, we ask whether such a rule can also be considered an "order of the Commission" within the terms of section 401(b) of the Communications Act. We note that several other courts have been asked to enforce the preemptive effect of the FCC's *Part 31* reconsideration decision pursuant to section 401(b), and a number of them have granted the requested injunctions. *See Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 738 F.2d 901 (8th Cir.1984); *South Central Bell Telephone Co. v. Louisiana Public Service Commission*, 570 F.Supp. 227 (M.D.La.1983); *Pacific Northwest Bell Telephone Co. v. Washington Utilities & Transportation Commission*, 565 F.Supp. 17 (W.D.Wash. 1983); *Chesapeake & Potomac Telephone Co. v. Public Service Commission*, 560 F. Supp. 844 (D.Md.1983). But none of the courts granting injunctions, aside from the district court below, have directly addressed the question the Maine P.U.C. has raised here: whether the FCC's decision constitutes an "order" in the contemplation of section 401(b). We conclude that it does not, for several reasons.

First, the Administrative Procedure Act defines the word "order" as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency *in a matter other than rulemaking* . . . ." 5 U.S.C. § 551(6) (emphasis added). Although this definition applies to the APA, enacted in 1946, and not necessarily to the Communications Act, enacted in 1934, the APA was the product of extensive study of pre-existing procedure. Some of its provisions—particularly those governing judicial review—were largely declaratory of existing law. Byse, *Vermont Yankee and the Evolution of Administrative Procedure: A Somewhat Different View*, 91 Harv.L.Rev. 1823, 1829 (1978). And, post-APA statutes and rules typically incorporate the APA's concepts and distinctions. Thus, even if pre-APA statutes used the term "order" inconsistently, procedural coherence warrants reference to the APA's definitions as a starting point and their use as a guide in determining the proper construction of pre-existing, related procedural statutes—at least where other non-APA considerations also point clearly in the same direction. *See Kroeger v. Stahl*, 148 F.Supp. 403, 406 (D.N.J.) (using APA definition of "order" in interpreting 47 U.S.C. § 401(b)), *aff'd*, 248 F.2d 121 (3rd Cir.1957).

Second, to interpret section 401(b) more broadly—to apply it beyond the context of the "adjudicatory order"—threatens to interfere seriously with the well established principle that the "enforcement" of the Communications Act is "entrusted primarily to an administrative agency." *Massachusetts Universalist Convention v. Hildreth & Rogers Co.*, 183 F.2d 497, 500 (1st Cir.1950); *see Lechtner v. Brownyard*, 679 F.2d 322, 327 (3d Cir.1982) ("The focus of the Act is the general public, with the FCC, not the private litigant, as its champion."). Section 401, in relevant part, reads as follows:

(a) The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of this chapter by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this chapter.

(b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

The first part, subsection (a), allows the *Commission* to ask a federal court to enjoin "a failure to comply with or a violation of any of the provisions" of the Act; the second part, subsection (b), allows a private person to require compliance with a Commission "order." Section 401(a) allows the Commission to decide precisely where and how to enforce the Act. Section 401(b) is consistent with the Commission's prerogatives under section 401(a) only if the term "order" is read to apply exclusively to those cases in which the Commission has previously considered and determined the specific rights and duties in question and where the private action seeks only to enforce the Commission's specific mandate. Only then would the Commission retain enforcement initiative, selecting a particular target for regulatory action and specifying the regulatory constraints that are to govern the target.

█ Third, to interpret "order" in section 401(b) broadly enough to encompass rules threatens the sound development of a coherent nationwide communications policy—a central objective of the 1934 Act.

*See* 47 U.S.C. § 151; *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940); *Benanti v. United States*, 355 U.S. 96, 104 n. 14, 78 S.Ct. 155, 159 n. 14, 2 L.Ed.2d 126 (1957). Rules are general in form and they can be highly general in content. *See, e.g., Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 418, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (1942) ("Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only on the parties to the particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply."); *Precious Metals Associates, Inc. v. Commodity Futures Trading Commission*, 620 F.2d 900, 911 (1st Cir. 1980) ("Rulemaking proceedings are . . . designed to fill in the interstices of a statute.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) and *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973)); *PBW Stock Exchange, Inc. v. SEC*, 485 F.2d 718, 732 (3rd Cir.1973) ("Rulemaking . . . characteristically involves . . . declaring generally applicable policies binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it."), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974).

■ To apply a rule to particular cases often (though not always) requires not only adjudicatory fact finding, but also interpretation of the rule's scope and meaning. *See, e.g., Gardner v. Toilet Goods Association*, 387 U.S. 167, 193–98, 87 S.Ct. 1526, 1539–42, 18 L.Ed.2d 704 (Fortas, J., dissenting) (1967); *Board of Trade v. Commodity Futures Trading Commission*, 704 F.2d 929, 932–33 (7th Cir.1983). To construe 401(b) to include a private right to enforce commission rules would place this interpretive function squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission. At best, responsibility for uniform policy would rest on the shoulders of an overworked (and inexpert) Supreme Court. The result would be to deprive the FCC of necessary flexibility and authority in creating, interpreting, and modifying communications policy. And one need only look at the highly general language in which some Commission rules are stated to realize that this shift of power from Commission to courts is not merely a theoretical concern. *See, e.g.,* 47 C.F.R. § 21.3 (general principles of telecommunications licensing); 47 C.F.R. § 73.1920 (personal attack rule). There is no reason to believe that Congress intended an interpretation of 401(b) that could threaten such a shift or undermine the well established bar against private actions to enforce the Communications Act. *See, e.g., Lechtner v. Brownyard, supra; Massachusetts Universalist Convention v. Hildreth & Rogers Co., supra.*

Fourth, the Act's statutory review provisions can be read more fairly and coherently if 401(b) is construed narrowly. The normal way to obtain review of an FCC order is for a party to petition a circuit court of appeals. 47 U.S.C. § 402; *see, e.g., City of Rochester v. Bond*, 603 F.2d 927, 934–35 (D.C.Cir.1979) (§ 402 as exclusive route to judicial review). Section 401(b) seems to foresee such review, for it discourages the district courts from reexamining the validity of the FCC "order" in question. It states that if, "after hearing, th[e] court determines that the order was regularly made and duly served," the court shall enforce obedience; this language suggests that the substantive validity of the order is not to be considered. *See Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 738 F.2d 901 (8th Cir.1984); *American Bond & Mortgage Co. v. United States*, 52 F.2d 318, 320 (7th Cir.1931), *cert. denied*, 285 U.S. 538, 52 S.Ct. 311, 76 L.Ed. 931 (1932); *United States v. National Plastikwear Fashions, Inc.*, 123 F.Supp. 791, 793–94 (S.D.N.Y.1954). This "split" of power between circuit and district courts (leaving 'review' to the first and 'enforcement against the disobedient' to the second) makes a degree of sense where an

'adjudicatory' order is at issue, for the 'disobedient person' in such a case was likely a party to the order and might have sought review of the agency decision in the circuit court. It makes far less sense and is far less fair in the case of an agency rule, which might well be enforced against persons not parties to the rulemaking proceeding. *Compare Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (administrative regulation can be enforced in proceeding which precludes review of validity of the regulation) *with Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (suggesting troubling nature of the *Yakus* holding and its limited reach) *and id.* at 289–90, 98 S.Ct. at 575 (Powell, J., concurring) (same). The anomaly of such a restriction on proceedings to enforce rules would have been perceived still more forcefully in 1934, when 'pre-enforcement' review of rules was virtually non-existent— when the validity of a rule was typically first considered at the time of enforcement. *See, e.g., Federal Power Commission v. Metropolitan Edison Co.,* 304 U.S. 375, 383–85, 58 S.Ct. 963, 966–68, 82 L.Ed. 1408 (1938); Verkuil, *Judicial Review of Informal Rulemaking,* 60 Va.L.Rev. 185, 196–97 & n. 55, 202–03 (1974). *Cf. Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 70–71 & n. 20, 91 S.Ct. 203, 209 & n. 20, 27 L.Ed.2d 203 (1970). And this fact makes it rather unlikely that Congress believed section 401(b) would apply to Commission rules.

Fifth, other sections of the Communications Act use the word "order" in a way that seems to envision Commission decisions requiring specific actions of specific carriers. *See, e.g.,* 47 U.S.C. §§ 201 (orders directing carriers to establish through services); 204 (orders concerning collection and refund of proposed increased rates); 205 (order directing carrier to cease and desist from charging unreasonable rates); 209 (order directing carrier to pay damages for violation of Act); 214(d) (order directing carrier to expand its facilities). With one exception, to which we shall turn shortly,

we are unaware of any provision that uses the word "order" to refer to FCC interpretations of the Act or to FCC rules of general applicability. Indeed, section 416 of the Act, 47 U.S.C. § 416(a), provides that "[e]very order of the Commission shall be forthwith served upon the designated agent of the carrier ...." This language suggests that Congress assumed that "orders" took the form of specific directives to specific parties.

Sixth, to allow communications common carriers to enforce generalized FCC policy against state commissions through 'enforcement' suits in federal district courts threatens issue splitting and procedural complexity. New England Telephone, for example, might readily have raised the 'depreciation' problem in the Maine Supreme Judicial Court, where it obtained review of the rest of the P.U.C.'s rate decision in which the depreciation issue was embedded. Instead, it expressly withheld the issue from that proceeding, bringing it before the federal district court instead, thereby leaving the state court in the difficult position of trying to judge the reasonableness of certain of the P.U.C.'s determinations—the selection of a rate of return fairly reflecting the risks to investors, for example—without considering the closely inter-related depreciation issue. The Maine courts were to review Hamlet without the Prince; the federal courts, the Prince without the rest of the play. Since the supremacy clause of the federal Constitution requires the Maine courts to apply federal communications law where appropriate, we see no reason to read the statute to encourage this form of fractionated review.

### III

Before concluding, we consider three arguments in New England Telephone's favor:

 First, in *Columbia Broadcasting System v. United States, supra,* the Supreme Court interpreted the word "order" in section 401's neighboring section, section 402, to encompass agency rules promulgat-

ed after rule-making proceedings. Thus, our interpretation requires reading the same word differently in the two sections. While we recognize the force of the argument calling for a similar construction, *see, e.g., Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932); *Firestone v. Howerton,* 671 F.2d 317, 320 & n. 6 (9th Cir.1982), we find sufficient difference in the functions of the two sections to justify assigning a different scope to the same word in the two settings. *See, e.g., United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1184–85 (6th Cir.1982), *aff'd,* —— U.S. ——, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 461 n. 230 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

Section 402(a), which the *CBS* Court considered, concerns judicial review of FCC decisions. It states

> Any proceeding to enjoin, set aside, annul, or suspend any *order* of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

47 U.S.C. § 402(a) (emphasis added); *see* 28 U.S.C. § 2342 ("The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of (1) all final *orders* of the Federal Communications Commission made reviewable by section 402(a) of title 47 ....") (emphasis added). *CBS* concerned the FCC's Chain Broadcasting Regulations, which told broadcasting stations in part how they were to deal with the networks. CBS argued that the Court should review the regulations' lawfulness, despite the absence of any enforcement order based on the regulations. If it had to wait until the regulations were enforced to secure judicial review of their validity, it might have to wait forever, CBS said, for the stations intended to obey the regulations, to CBS's detriment. Thus, to interpret "order" in section 402 to apply only to the outcome of an adjudicatory enforce-

ment proceeding would deprive those who might be seriously injured by others' obedience to an FCC rule of any opportunity to challenge the rule's legal validity. The Court agreed. And it considered the regulations to have sufficiently serious and immediate impact to warrant pre-enforcement review of their lawfulness. Accordingly, rules were swept within the scope of section 402's reference to "any order."

As this statement of the issues in *CBS* reveals, the policy concerns relevant to a proper interpretation of the word "order" in section 402 involve fundamental principles of judicial review and fair treatment. These concerns point towards a broad interpretation of the word in section 402, but no such considerations are at issue in the case of section 401. To the contrary, private parties have no inherent right to enforce FCC rules, and, as we have remarked above, considerations of fairness favor, if anything, a narrow construction of section 401's reference to "any order." In the absence of some strong policy reason favoring a broad interpretation of "order" in section 401, the various considerations previously discussed seem sufficient to outweigh the importance of linguistic uniformity among *different sections* of the statute.

■ Second, New England Telephone denies that the FCC decision here at issue was embodied in a "rule;" rather, it contends we should consider it as an adjudicatory order. The decision was called a "Memorandum Opinion and *Order*" (emphasis added); and it was issued as a "declaratory order" pursuant to 47 C.F.R. § 1.2 (authorizing the Commission to issue declaratory rulings, in accordance with section 5(e) of the APA, 5 U.S.C. § 554(e)). As the Supreme Court has said, however, "[t]he particular label placed upon [a decision] by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive." *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. at 416, 62 S.Ct. at 1200. The FCC commonly adopts rules in opin-

ions called "orders." *See, e.g.,* 47 C.F.R. § 1.429(i); *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. at 425, 62 S.Ct. at 1204. And, in this instance, the proceedings that led to the decision were "properly treated by the FCC as rulemaking proceedings under 47 C.F.R. §§ 1.399–1.429." 570 F.Supp. at 1571. The FCC has confirmed that the decision "was adopted as part of a rulemaking docket." Memorandum of Federal Communications Commission as Amicus Curiae at 16. There is no indication that anyone followed adjudicatory, rather than rulemaking, procedures.

The temptation to refer to the FCC's deliberations as an "adjudicatory proceeding" that led to a "declaratory order" arises from the FCC's consolidation of the pure *Part 31* rulemaking proceeding with GTE of Ohio's declaratory action against the Ohio Public Utilities Commission. The latter action—entitled "Petition for Declaratory Ruling"—might perhaps be regarded as adjudicatory, despite its consolidation into a rulemaking proceeding. But even if its culminating order was regarded as enforceable under § 401(b), it would be enforceable against the Ohio P.U.C., not the Maine P.U.C., which was not a party to the declaratory action. (Nor for that matter was the Maine Commission a party to the Part 31 proceeding with which the Ohio proceeding was consolidated.)

Third, New England Telephone points to the importance of the policy that the FCC is trying to vindicate with its effort to enforce uniform national depreciation rules. The threat of uneconomic bypass of the existing telephone system is arguably serious and may well justify regulatory decision-making by a single national authority. Moreover, New England Telephone suggests that the FCC's authority to impose preemptive nationwide rules is obvious. *See, e.g., Computer & Communications Industry Association v. FCC,* 693 F.2d 198, 214–18 (D.C.Cir.1982), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *North Carolina Utilities Commission v. FCC,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). Thus, it believes the Maine commission is acting contrary to clear law. Assuming, for the sake of argument, that all this is true, however, why must section 401(b) offer the only remedy? The federal courts are currently considering the substantive arguments concerning the FCC's authority. *Virginia State Corporation Commission v. FCC, supra.* Is it not reasonable to assume that the Maine commission and the Maine courts will read the decision? And, in the meanwhile, does New England Telephone not have a remedy sufficient to ameliorate any serious threat to the national telephone network through section 401(a); can it not ask the Commission to bring an enforcement action if the threat is truly serious? Finally, why can it not obtain an adjudication from the FCC against the Maine commission, through the same declaratory ruling procedure employed by GTE of Ohio, and *then* enforce the resultant order under 401(b) if necessary? Of course, in the process, the FCC likely will have to decide how important it is to vindicate New England Telephone's position. But this agency check permits assurance that New England Telephone's claim of public importance is correct, a determination that is properly left in the first instance to the FCC.

In sum, we conclude that New England Telephone cannot bring this case in federal court under the authority of section 401(b).

*The injunction is vacated and the case is remanded to the district court with instructions to dismiss the action.*

## MEMORANDUM AND ORDER

This court held that private parties could not use § 401(b) of the Communications Act to enforce an FCC rule because the word "order" in that section does not include agency rules, but, rather, refers to 'adjudicatory' orders. New England Telephone, with support from the FCC, seeks a rehearing. The panel's opinion considered most of the arguments they raise; but three points require further comment.

■ First, New England Telephone now argues that the district court enforced, not only the FCC's *Preemption Order* (a 'rulemaking' order), but also the *Prescription Order* (an 'adjudicatory' order); it adds that the latter order provides adequate basis for § 401(b) jurisdiction. This case, however, concerns an effort to apply the FCC's depreciation rules to *intra*-state rates. And, as we explained in our opinion, the *Prescription Order* expressly left open the question of where its rules would apply. The FCC decided to apply them *intra*-state in its later *Preemption* decision. Hence, this case is most naturally viewed as an effort to enforce the FCC's *Preemption Order*, which, in turn, incorporates the pre-existing *Prescription Order* depreciation rules. New England Telephone apparently began this case with this view, for it alleged in its complaint that it was "being substantially and irreparably harmed by Defendant PUC's unlawful refusal to obey the FCC's *Preemption Order*" (Complaint at 5); and New England Telephone asked that the PUC's action be declared unlawful in part "because it violates the *Preemption Order*, the Communications Act, and the United States Constitution," *id.* at 10. The FCC, in its amicus brief filed below, also characterized the case as one seeking enforcement of the *Preemption Order. See* Memorandum of Federal Communications Commission as Amicus Curiae, at 3. ("The FCC order that is before this Court for enforcement" is the Preemption Order.) The district court thought the same. *See* 570 F.Supp. 1558, 1565 (D.Me. 1983); 565 F.Supp. 949, 954 (D.Me.1983). The first serious effort to recharacterize this case as one to enforce the *Prescription Order* (and to bring it via that route within 401(b)'s scope) appears in New England Telephone's rehearing petition. To accept its argument now would be unfair to other parties in the case. Thus, we reject it for that reason and because we believe it an unnatural, and hence incorrect, characterization of this federal suit.

■ Second, the FCC argues that our opinion runs contrary to precedent. But, that is not so. The main case the FCC cites, *Ambassador, Inc. v. United States*, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945), appears to involve, not Communications Act § 401(b), but, rather, § 401(a). The *Ambassador* suit was brought by the Attorney General on behalf of the FCC to enforce a rule contained in a telephone company tariff. The Supreme Court found jurisdiction because "a departure" from the tariff "is forbidden by the Act," *id.* at 325, 65 S.Ct. at 1155, thus bringing the suit within the terms of § 401(a) (suit by Attorney General authorized "at the request of the Commission, alleging ... a violation of any of the provisions of this chapter ...."). The suit also involved joinder of subscribers as parties under 47 U.S.C. § 411, which (in language that appears to apply to suits under § 401(a), but not under § 401(b)) authorizes joinder in proceedings "for the enforcement of the provisions of this *chapter*" (emphasis added). The FCC correctly points out that the *Ambassador* Court does not cite § 401(a). It cites only to § 401 in general, without specifying "(a)" or "(b)". This fact, however, could at most show no more than that *Ambassador* is ambiguous. Ambiguity and court silence do not amount to controlling precedent. The second case the FCC relies upon, *Brookhaven Cable TV, Inc. v. Kelly*, 428 F.Supp. 1216 (N.D.N.Y.1977), *aff'd*, 573 F.2d 765 (2d Cir.1978), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979) involved, not rulemaking, but a declaratory order as to which the defendant was a party. The *Brookhaven* court explicitly refused to decide the § 401(b) question and instead rested jurisdiction on other grounds. The remaining cases, in district courts, arise out of the current depreciation controversy. As we said before, in none of them does the court directly address the question here at issue. Thus, we believe this a case of first impression. And the fact that we can find no reported instance in section 401(b)'s fifty year history in which a private party has used it to enforce an FCC rule is some evidence that it has not conventionally been thought designed for that purpose.

Third, the FCC appeals to "expertise" and "administrative convenience" to bolster its support for the telephone company's position. We do not believe that these considerations are sufficiently powerful here, however, to turn the tide. For one thing, the FCC's claim of an administrative 'need' to enlist private, § 401(b), rule-enforcement efforts is not totally plausible in light of the lack of precedent. Perhaps such private enforcement efforts would help the FCC deal with potentially hostile state commissions in the immediate context of current telephone deregulation. But, if one steps back to ask the broader question —whether, *in general,* a private right to enforce FCC rules is likely to serve the Communications Act's regulatory ends— one must be more doubtful. As we previously stated, given the general language and broad scope of many FCC rules, to allow private rule enforcement risks significant court interference with FCC control over its own docket, with the FCC's power to interpret its own rules, and with the FCC's ability to set its own communications policy. The FCC now argues that, when rules are unclear, a § 401(b) court could use the doctrine of 'primary jurisdiction' to obtain commission clarification. The primary jurisdiction doctrine, however, lacks both the clarity and the practical efficacy that would be necessary to repair such a contorted court/agency relationship. *See Distrigas of Massachusetts Corp. v. Boston Gas Co.,* 693 F.2d 1113, 1119 (1st Cir. 1982); *cf.* Jaffe, *Primary Jurisdiction,* 77 Harv.L.Rev. 1037 (1964). Rather than rely upon this complex, ad hoc legal device, we draw the simpler conclusion that Congress did not intend Commission rules to fall within the scope of § 401(b)'s word "order," thereby leaving control of their interpretation and enforcement primarily in the hands of the FCC.

For another thing, we cannot accept the FCC's claim that we should simply defer to its view of the law, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council,* —— U.S. ——, ——, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Its "views" here do not reflect agency policy reached after debate among staff or commissioners. Rather, as far as we can tell, they simply represent the General Counsel's interpretation of the statute; they are contained only in his brief. *Cf. Investment Company Institute v. Camp,* 401 U.S. 617, 626–28, 91 S.Ct. 1091, 1097–98, 28 L.Ed.2d 367 (1971) (counsel's efforts in course of litigation are "hardly tantamount to an administrative interpretation" of a statute); *see generally Mayburg v. Secretary of Health and Human Services,* 740 F.2d 100 (1st Cir.1984) (discussing factors determining weight to be given to administrative interpretations of statutes). While counsel's experience entitles his opinion to respect, it cannot bind a court as to the meaning of a jurisdictional statute. Moreover, the FCC's legal argument here threatens a highly anomalous result. Its view of statutory construction is one that would place primary authority to decide pure questions of statutory law in the hands of the agency. At the same time, its interpretation of the statute in question is one that would place considerable authority to decide questions of communications policy in the hands of the courts. Each institution—court and agency—would receive comparatively greater power in the area in which it, comparatively, *lacks* expertise. The resulting picture is one of classical administrative law principle turned upside down. At least, the position seems inconsistent with the sound court/agency working partnership that administrative law traditionally has sought.

*The petition for rehearing is denied.*