241 F.3d 242 (2nd Cir. 2001)
 EDWARD J. CONBOY, EILEEN M. CONBOY, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
AT&T CORP. and AT&T UNIVERSAL CARD SERVICES CORP., Defendants-Appellees,
THE ELECTRONIC PRIVACY INFORMATION CENTER, Amicus Curiae.
 No. 00-7284
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 January 11, 2001, Argued
February 26, 2001, Decided
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 HENRY H. ROSSBACHER (James S. Cahill, Clara I. Duran Reed, of counsel), Rossbacher & Associates, Los Angeles, CA; Daniel T. Hughes, Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York, NY; Jonathan W. Cuneo, Michael G. Lenett, The Cuneo Law Group, P.C., Washington, DC, for Plaintiffs-Appellants Edward J. Conboy and Eileen M. Conboy.
 PETER D. KEISLER (Virginia A. Steitz, Stephen B. Kinnaird, of counsel), Sidley & Austin, Washington, DC; Laura A. Kaster, Edward A. Harris, AT&T Corp., Basking Ridge, NJ, for Defendant-Appellee AT&T Corp.
 GEORGE A. ZIMMERMAN (Lauren E. Aguiar, Andrew Wisch, of counsel), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant-Appellee AT&T Universal Card Services Corp.
 David L. Sobel, Marc Rotenberg, Electronic Privacy Information Center, Washington, DC (Harry C. Batchelder, Jr., New York, NY, of counsel), filed a brief for Amicus Curiae Electronic Privacy Information Center.
 Before: KEARSE, JACOBS, and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 We are asked to decide whether plaintiffs have stated a cause of action against their long-distance service provider and its once-affiliated credit card company for allegedly transmitting and using certain information contained in plaintiffs' long-distance bill for purposes of collecting credit card debt. Plaintiffs Edward and Eileen Conboy allege that defendant AT&T Corp. ("AT&T") improperly disseminated proprietary information about them to defendant AT&T Universal Card Services Corp. ("UCS") to help UCS collect credit card debt. Plaintiffs claim that, in disseminating this information, AT&T violated: (1) Section 222 of the Telecommunications Act of 1996 ("Telecommunications Act" or "Act"), Pub. L. No. 104-104, 110 Stat. 56; (2) two regulations-- 47 C.F.R. 51.217 and 64.1201--promulgated by the Federal Communications Commission ("FCC") under the Act, and (3) the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq. Plaintiffs also claim that, in using the disseminated information, UCS violated Section 349 of New York's General Business Law and New York's common law prohibiting intentional infliction of emotional distress.
 
 
 2
 In a thoughtful and comprehensive opinion, the United States District Court for the Southern District of New York (Robert J. Ward, Judge) dismissed plaintiffs' entire amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See Conboy v. AT&T Corp., 84 F. Supp. 2d 492 (S.D.N.Y. 2000). It held that plaintiffs: (1) failed to allege recoverable damages under the Telecommunications Act; (2) had no private right of action to seek monetary relief for alleged violations of 47 C.F.R. 51.217 and 64.1201; (3) were not entitled to injunctive relief under the Telecommunications Act; (4) were not "consumers" for purposes of their claim under the Fair Debt Collection Practices Act; (5) failed to allege "deceptive" conduct to support their claim under New York's General Business Law; and (6) failed to allege extreme and outrageous conduct to support their common law claim of intentional infliction of emotional distress. The District Court also declined to grant plaintiffs' request to file a second amended complaint containing a claim of conspiracy to violate the Telecommunications Act. On appeal, plaintiffs challenge each of these holdings. For the reasons stated below, we affirm.
 
 I. BACKGROUND
 
 3
 Because this is an appeal from a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we review the District Court's decision de novo, taking all factual allegations in the amended complaint as true and construing all reasonable inferences in favor of plaintiffs. See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).
 
 
 4
 This case arises out of a claim that AT&T disseminated, and continues to disseminate, proprietary information about its customers to UCS and other unidentified companies in order to help them collect credit card debt. Prior to this suit, AT&T served as plaintiffs' long-distance telephone carrier. During this time, AT&T had access to information contained in plaintiffs' long-distance telephone bill, such as their names, unlisted phone number, billing address, and the details of their long-distance calls. Plaintiffs never authorized the release of this information to UCS or to anyone else, and even paid a monthly fee for "non-published service," the purpose of which was to prevent the *release of their names, address, and telephone number to any directory or anyone who directed inquiries to directory assistance.
 
 
 5
 Plaintiffs' adult daughter-in-law, Maria Conboy, held a MasterCard issued by UCS when UCS was a subsidiary of AT&T.[1] Plaintiffs were neither the guarantors of their daughter-in-law's credit card, nor otherwise obligated to pay her debt to UCS. Plaintiffs also did not agree to be contacted by UCS regarding their daughter-in-law's account, and Maria Conboy never provided UCS with their names, address, or telephone number.
 
 
 6
 From May to June 1998, representatives of UCS telephoned plaintiffs at their unlisted home telephone number between thirty and fifty times seeking information about Maria Conboy's whereabouts. The telephone calls were made repeatedly, and some were made at unusual hours. Plaintiffs informed the UCS representatives that Maria Conboy did not reside with them and requested that the telephone calls cease. Nonetheless, the phone calls continued. During one call, a representative revealed that he knew plaintiffs' unlisted personal information and the details of their long-distance telephone bill. Plaintiffs surmised that AT&T had provided UCS with this information to help UCS collect credit card debt.
 
 
 7
 In May 1999, plaintiffs filed an amended class-action complaint against AT&T and UCS. They claimed that, by disseminating information contained in their long-distance bill, AT&T violated: (1) Section 222(c) of the Telecommunications Act; (2) two FCC regulations-- 47 C.F.R. 51.217(c)(3)(iii) and 64.1201(c)(2); (3) the Fair Debt Collection Practices Act ("FDCPA"); (4) Section 349 of New York's General Business Law; and (5) New York's common law prohibiting intentional infliction of emotional distress. They also contended that UCS committed the fourth and fifth violations concerning New York General Business Law 349 and intentional infliction of emotional distress, by calling their residence at all hours in an attempt to collect credit card debt.
 
 
 8
 The District Court dismissed the entire amended complaint for failure to state a claim upon which relief can be granted. See Conboy, 84 F. Supp. 2d at 492. With respect to the claims against AT&T, the District Court held that plaintiffs: (1) failed to allege recoverable monetary damages under Sections 206 and 207 of the Communications Act of 1934 ("Communications Act"), 47 U.S.C. 151 et seq., which govern private rights of action against common carriers under the Telecommunications Act; (2) had no explicit or implied right of action to seek monetary damages for alleged violations of 47 C.F.R. 51.217 and 64.1201; (3) could not seek injunctive relief under the circumstances of this case; and (4) failed to qualify as "consumers" for purposes of their claim under the FDCPA. Having dismissed these federal claims, the District Court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims against AT&T. The District Court also dismissed both claims against UCS on the ground that UCS's alleged conduct of calling plaintiffs in an attempt to collect credit card debt was neither "deceptive, " as defined by New York General Business Law 349(a), nor "extreme and outrageous," as required to state a common law claim of intentional infliction of emotional distress. The District Court also declined to grant plaintiffs' motion to amend their complaint for a second time to include a claim against AT&T and UCS for conspiracy to violate the Telecommunications Act.
 
 
 9
 On appeal, plaintiffs challenge each of these holdings. We discuss each issue in turn.
 
 II. DISCUSSION
 
 10
 A. Damages Under Sections 206 and 207 of the Communications Act for Violations of Section 222(c) of the Telecommunications Act
 
 
 11
 Plaintiffs' first argument is that AT&T disseminated their customer proprietary network information ("CPNI")[2] in violation of Section 222(c) of the Telecommunications Act,[3] and that they can recover damages as a result under Sections 206[4] and 207[5] of the Communications Act. As an initial matter, we need not decide which types of information allegedly disseminated by AT&T constitutes CPNI because, even if we assume arguendo that AT&T disseminated plaintiffs' CPNI in violation of Section 222(c), we agree with the District Court that plaintiffs failed to allege recoverable damages under Sections 206 and 207.
 
 
 12
 The District Court provided three reasons for why plaintiffs failed to allege recoverable damages. See Conboy, 84 F. Supp. 2d at 499-500. First, plaintiffs' monthly telephone bill clearly indicated that their payments for "non-published service" had gone to their local-exchange carrier Bell Atlantic, not defendant AT&T. See id. at 499. The telephone bill attached to plaintiffs' amended complaint was divided into two sections--one for Bell Atlantic charges and the other for AT&T charges. Plaintiffs' monthly payment of $ 1.95 for "non-published service" fell on the Bell Atlantic section of the bill. Accordingly, plaintiffs could not seek to recover these payments from AT&T.
 
 
 13
 Second, plaintiffs' monthly payments to AT&T for long-distance service did not include an explicit or implicit payment for the privacy protections of the Telecommunications Act. See id. As the District Court explained, "there is no monetary value attached to AT&T's compliance with the Telecommunications Act." Id. By paying their AT&T bill monthly, "plaintiffs got what they paid for, namely, long distance service." Id. These payments therefore could not serve as a basis for damages.
 
 
 14
 Third and finally, damages are not presumed to arise from violations of Section 222. See id. at 498 n.3. The District Court explained that Sections 206 and 207 of the Communications Act are based on provisions of the Interstate Commerce Act ("ICA"), and that courts have consistently held that the ICA does not permit recovery of "presumed damages."[6] Accordingly, in the District Court's view, such damages are not available in the analogous provisions of the Communications Act. See id.
 
 
 15
 On appeal, plaintiffs challenge all three bases for the District Court's holding. Even though plaintiffs do not challenge the finding that they had paid Bell Atlantic, not AT&T, for "non-published service," they argue that they lost the value of this service because of AT&T's violation of Section 222(c).
 
 
 16
 Moreover, plaintiffs argue that their monthly payments to AT&T for long-distance service contained an implicit payment for AT&T's compliance with the Telecommunications Act, and that disclosure of plaintiffs' private information deprived them of the full value of these payments.
 
 
 17
 Finally, plaintiffs contend that, even if they failed to allege specific economic damages, Sections 206 and 207 permit recovery of "presumed damages" for emotional distress and mental anguish arising from violations of Section 222. According to plaintiffs, Congress passed Section 222(c) of the Telecommunications Act in 1996 to protect consumer privacy, and presumed "dignitary damages" are traditional remedies for privacy violations. Plaintiffs argue that Congress therefore implicitly expanded the scope of Sections 206 and 207 to include such damages when it passed Section 222(c).
 
 
 18
 We disagree with all three of plaintiffs' arguments. First, plaintiffs cannot use their payment to Bell Atlantic for "non-published service" as the basis for their claim for damages against AT&T, because these payments represent the value of Bell Atlantic's compliance--not AT&T's compliance--with the terms of the "non-published service" agreement. Plaintiffs have not alleged that AT&T had an obligation to provide plaintiffs with "non-published service," nor have they alleged that AT&T somehow had led Bell Atlantic to disclose plaintiffs' information in violation of the "non-published service" agreement. Accordingly, plaintiffs cannot seek recovery of their payments for "non-published service" in the case at hand.
 
 
 19
 Second, as the District Court correctly noted, plaintiffs did not make monthly payments to AT&T for compliance with the Telecommunications Act; rather, they paid AT&T for long-distance telephone service, which they received. AT&T's alleged failure to comply with the Telecommunications Act did not deprive them of the value of this service.
 
 
 20
 Moreover, we agree with the District Court that AT&T must comply with the Telecommunications Act not because it receives monthly payments from its customers, but because it is a common carrier governed by that statute. See Conboy, 84 F. Supp. 2d at 499. Indeed, even if plaintiffs had failed to pay their regular monthly telephone bills, AT&T would still have had an obligation to comply with the provisions of the Act. Accordingly, it cannot be argued that plaintiffs' monthly payments were, in part, consideration paid to AT&T for compliance with Section 222.
 
 
 21
 Third and finally, we agree with the District Court that plaintiffs cannot recover "presumed damages" for emotional distress and mental anguish arising from violations of the Act. As a preliminary matter, it is clear to us that plaintiffs explicitly abandoned any claim for emotional distress damages. After AT&T filed its reply brief in support of its motion to dismiss, plaintiffs filed a surreply letter stating that they "have not alleged emotional distress nor similar damages for violation of the [Telecommunications] Act." See Letter to Hon. Robert J. Ward from Daniel T. Hughes at 2 (Sept. 22, 1999) (emphasis in original). This statement constitutes an express and binding abandonment of plaintiffs' claim for such damages. Cf. Bellmore v. Mobil Oil Corp., 783 F.2d 300, 307 (2d Cir. 1986) (holding that a plaintiff waived his right to a jury trial where he disclaimed this right in a memorandum of law provided to the trial court).
 
 
 22
 Even if we assume arguendo that plaintiffs did not abandon their claim for presumed damages, we hold that such damages are nonetheless unrecoverable. As noted by the District Court, Sections 206 and 207 of the Communications Act were expressly modeled on the enforcement provisions of the ICA. See H.R. Rep. No. 73-1850, at 6 (1934) ("Sections 206 [and] 207 [of the Communications Act] . . . are the present law in sections 8 [and] 9 . . . of the Interstate Commerce Act . . . ."). Not surprisingly, therefore, we have held that decisions construing the ICA are persuasive in establishing the meaning of the Communications Act, see American Tel. & Tel. Co. v. United Artists Payphone Corp., 852 F. Supp. 221, 222 (S.D.N.Y.), aff'd, 39 F.3d 411 (2d Cir. 1994), and the Supreme Court has held that the ICA does not authorize the recovery of presumed damages, see, e.g., ICC v. United States ex rel. Campbell, 289 U.S. 385, 390, 53 S. Ct. 607, 77 L. Ed. 1273 (1933); Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 164-65, 67 L. Ed. 183, 43 S. Ct. 47 (1922); see also Overbrook Farmers Union Coop. Ass'n v. Missouri Pac. R.R. Co., 21 F.3d 360, 364 (10th Cir. 1994) (explaining that a number of Supreme Court decisions limit carrier liability under section 8 of the ICA to "actual damages"); Ajayem Lumber Corp. v. Penn Cent. Transp. Co., 487 F.2d 179, 183 (2d Cir. 1973) (explaining that recovery under the ICA is limited to damages "actually suffered"). Based on these authoritative interpretations of the ICA, the FCC has concluded that the Communications Act also does not permit the recovery of presumed damages. See In re Communications Satellite Corp., 97 F.C.C.2d 82, P 24, at 90 (1984) ("It is beyond doubt that under both Title II of the Communications Act and its predecessor, the Interstate Commerce Act (ICA), damages are not presumed to flow from violations of the Acts."). Accordingly, a private party seeking relief under Sections 206 and 207 of the Communications Act must "allege and prove specific damages flowing from violations of the Act," and cannot recover presumed damages. Id. P 25, at 90.[7]
 
 
 23
 When Congress enacted Section 222 in 1996, it provided no evidence that it intended to expand the scope of recoverable damages under Sections 206 and 207. It neither amended the language of Section 206 or 207, nor added language in Section 222 suggesting that presumed damages would now be available under the Communications Act. It is unlikely, therefore, that Congress intended to change the scope of damages typically recoverable under the Communications Act. See generally South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351, 139 L. Ed. 2d 773, 118 S. Ct. 789 (1998) ("We assume that Congress is aware of existing law when it passes legislation." (citation omitted)). This view is supported by the existence of other provisions of the Communications Act that expressly provide for a presumed-damages remedy. See, e.g., 47 U.S.C. 605(e)(3)(C)(i)(II) (providing for the recovery of presumed, or "statutory," damages from carriers who divulge the "contents" or "substance" of communications in violation of 47 U.S.C. 605(a)). Congress, therefore, clearly knew how to permit the recovery of presumed damages for a violation of the Telecommunications Act; if it had intended to so for Section 222, it would have done so expressly.
 
 
 24
 Moreover, as a general matter, federal law permits the recovery of presumed damages only in limited circumstances. As the Supreme Court has explained, presumed damages are generally available only where the offense, by its very nature, is "virtually certain" to cause mental and emotional distress, so "there arguably is little reason to require proof of this kind of injury." Carey v. Piphus, 435 U.S. 247, 262, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978).[8]
 
 
 25
 In the case at bar, it is "not reasonable to assume that every" violation of Section 222, "No matter what the circumstances or how minor, inherently is . . . likely" to cause mental and emotional distress. Id. at 263. Many customers will not notice when their personal information is disseminated in violation of Section 222. Moreover, those who learn of a violation may not even care. violations of Section 222, Therefore, are not "virtually certain" to cause some type of serious injury, Id. at 262, making presumed damages an inappropriate remedy for such violations. Accordingly, the district court properly denied plaintiffs' claim for such damages.
 
 
 26
 B. Private Right Of Action for Damages Under 47 C.F.R. 51.217 and 64.1201
 
 
 27
 Plaintiffs assert next that AT&T violated two FCC regulations issued under the Telecommunications Act-- 51.217(C)(3)(III)[9] and 64.1201(c)(2)[10] and that they can recover monetary damages as a result. The District Court rejected this argument on the ground that the Telecommunications Act neither provides for an explicit nor implicit private right of action for a violation of these regulations. See Conboy, 84 F. Supp. 2d at 500-02.
 
 
 28
 We agree. "The question of the existence of a statutory cause of action is, of course, one of statutory construction." Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979). In this case, the text of the Telecommunications Act contains no language that explicitly provides a private right of action for damages for violations of the two FCC regulations at issue here. Section 401(b) of the Communications Act permits private parties to enforce FCC "orders," but it does not provide authority for the recovery of damages.[11]
 
 
 29
 Moreover, no private right of action for money damages can be implied. In Cort v. Ash, 422 U.S. 66, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975), the Supreme Court established a four-factor test to determine whether a federal statute creates an implied right of action: (1) whether the statute was enacted to benefit a special class; (2) whether the drafters intended to create a private right of action; (3) whether a private right of action would be consistent with the purposes of the statute; and (4) whether the cause of action is one not traditionally relegated to the states. Id. at 78. The Court thereafter instructed that the second factor--Congressional intent--is the critical inquiry, see Touche Ross, 442 U.S. at 575-76; see also McClellan v. Cablevision of Conn., Inc., 149 F.3d 161, 164 (2d Cir. 1998) (explaining that the other factors are treated as proxies for Congressional intent), and that the burden of demonstrating Congressional intent rests with the plaintiff, see Suter v. Artist M., 503 U.S. 347, 363-64, 118 L. Ed. 2d 1, 112 S. Ct. 1360 (1992); see also New York City Envtl. Justice Alliance v. Giuliani, 214 F.3d 65, 73 (2d Cir. 2000) ("The person seeking a private remedy bears the burden of demonstrating that Congress intended to make one available.").
 
 
 30
 Plaintiffs failed to meet their burden here. As the District Court correctly noted,
 
 
 31
 the FCC is primarily responsible for the interpretation and implementation of the Telecommunications Act and FCC regulations. These broad powers granted to the FCC to enforce the Act would be inconsistent with a private right of action because "private litigation tends to transfer regulatory interpretation and discretion from the agency to the courts."
 
 
 32
 Conboy, 84 F. Supp. 2d at 501 (alteration in original) (citations omitted) (quoting Caceres Agency, Inc. v. Trans World Airways, Inc., 594 F.2d 932, 934 (2d Cir. 1979)).
 
 
 33
 Indeed, a private right of action would place the FCC's "interpretative function squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission. . . . The result would be to deprive the FCC of necessary flexibility and authority in creating, interpreting, and modifying communications policy." New England Tel. & Tel. Co. v. Public Utils. Comm'n, 742 F.2d 1, 6 (1st Cir. 1984)(Breyer, J.). It is highly unlikely, therefore, that Congress intended to create a private right of action for violations of FCC regulations. Such a right would "threaten[ ] the sound development of a coherent nationwide communications policy--a central objective of the [Communications] Act." Id. at 5.
 
 
 34
 The text of the Telecommunications Act also suggests that Congress did not intend to provide a private right of action. It is a principle of statutory construction that "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458, 38 L. Ed. 2d 646, 94 S. Ct. 690 (1974). Here, Sections 206 and 207 of the Communications Act grant private parties, in circumstances other than the one presented here, an express right of action against common carriers that improperly disseminate their CPNI. It is unlikely, therefore, that Congress intended to provide parties with another, merely implied right of action against common carriers that violate the two FCC regulations at issue here, which seek to prevent similar conduct. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 20, 62 L. Ed. 2d 146, 100 S. Ct. 242 (1979) ("In view of these express provisions for enforcing the duties imposed . . ., it is highly improbable that Congress absentmindedly forgot to mention an intended private action." (quotation marks omitted)).
 
 
 35
 This conclusion is bolstered by the existence of other provisions in the Telecommunications Act that explicitly provide for a private right of action for a violation of FCC regulations. For example, Section 227(b)(2) of the Act requires the FCC to implement regulations prohibiting any person from making a call with an automatic telephone dialing system or an artificial prerecorded voice to, inter alia, an emergency telephone line (such as 911) or a patient's room in a hospital. See 47 U.S.C. 227(b)(1), (2) (Supp. 2000). If a person violates these regulations, a private party is expressly authorized under Section 227(b)(3) to bring suit in state court. See id. 227(b)(3). Another provision--Section 227(c)(5)--contains similar language. Under Section 227(c)(2), the FCC must prescribe regulations to protect consumers from unwanted telephone solicitations. Section 227(c)(5) expressly permits any person "who has received more than one telephone call within any 12-month period" in violation of these regulations to bring a private action in state court. Id. 227(c)(5). "Obviously, then," as the Supreme Court has observed, "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." Touche Ross, 442 U.S. at 572. The absence of any comparable language with respect to the statutory underpinnings of 47 C.F.R. 51.217 and 64.1201 indicates that Congress did not intend to create a private right of action with respect to these regulations. Accordingly, the second factor--Congressional intent--weighs strongly against implying a private right of action.
 
 
 36
 The remaining factors do not change this result. As the Third Circuit has explained, the purpose of the Telecommunications Act is not to benefit individual plaintiffs but to "protect the public interest in communications." Lechtner v. Brownyard, 679 F.2d 322, 327 (3d Cir. 1982) (quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14, 86 L. Ed. 1229, 62 S. Ct. 875 (1942)); cf. Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 97 (2d Cir. 1986) (finding that the Federal Aviation Act was designed to benefit the general public and not any particular class). It cannot be said, therefore, that plaintiffs are members of a class "for whose especial benefit the statute was enacted." Cort, 422 U.S. at 78. The first Cort factor--whether the statute was enacted to benefit a special class of which plaintiffs are members--therefore weighs against implying a private right of action.
 
 
 37
 Inasmuch as the first two Cort factors indicate clearly that Congress did not intend to create a private right of action, we need not consider the remaining factors because, alone or together, they cannot constitute sufficient evidence of Congressional intent. See Health Care Plan, Inc. v. Aetna Life Ins. Co., 966 F.2d 738, 742 (2d Cir. 1992); see also Touche Ross, 442 U.S. at 580 (Brennan, J., concurring) ("The [third and fourth] Cort factors cannot by themselves be a basis for implying a right of action."). Accordingly, no private right of action under 47 C.F.R. 51.217 and 64.1201 can be implied, and the District Court properly dismissed these claims.
 
 
 38
 C. Private Injunctive Relief Under the Telecommunications Act
 
 
 39
 The next issue is whether plaintiffs can seek injunctive relief for the alleged violations of Section 222 and 47 C.F.R. 51.217 and 64.1201. The District Court denied this relief on the ground that the Telecommunications Act does not authorize private injunctive relief under the circumstances of this case. On appeal, plaintiffs challenge this conclusion, arguing that the District Court had the right to grant this requested relief under (1) Section 401(b) of the Communications Act and (2) the federal courts' inherent equitable powers. We find both of plaintiffs' arguments unconvincing.
 
 
 40
 First, plaintiffs abandoned any claim for injunctive relief under Section 401(b), which allows the FCC and private parties to enforce FCC "orders" by seeking injunctive relief in a district court, see ante note 11. In their papers in opposition to AT&T's motion to dismiss, plaintiffs expressly stated that, for purposes of their claim for injunctive relief, they were "asserting their rights to bring causes of actions for violations of the Act under section 207, not section 401(b)." Plaintiff's Opposition to Defendant AT&T Corporation's Motion to Dismiss First Amended Class Action Complaint at 7 (filed Aug. 5, 1999) (emphasis in original). Plaintiffs explained that they were relying on Section 207, rather than Section 401(b), because Section 207 did "not limit [the] Court's jurisdiction to grant injunctive relief and [its] inherent equitable power to issue injunctions." Id. at 7-8. Plaintiffs therefore have abandoned any possible claim under Section 401(b) for injunctive relief.
 
 
 41
 Second, we are not persuaded by plaintiffs' argument that the District Court could enter an injunction based on its inherent equitable authority. Federal courts generally have inherent power to grant injunctive relief, but this power can be limited by statute. As we explained nearly a quarter century ago, "subject to due process limitations, Congress may grant jurisdiction over particular subject matter of the federal courts while withholding the power to give certain remedies." In re Letourneau, 559 F.2d 892, 894 (2d Cir. 1977). To do this, however, Congress must "speak clearly" of its intent to "interfere with the historic equitable powers of the courts"; otherwise, no diminution in the courts' remedial powers may be inferred. Id.
 
 
 42
 Congress has "spoken clearly" here. According to the Supreme Court, Congress restricts a court's equitable power when a statute limits that power "in so many words, or by a necessary and inescapable inference." Porter v. Warner Holding Co., 328 U.S. 395, 398, 90 L. Ed. 1332, 66 S. Ct. 1086 (1946); accord Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 291, 4 L. Ed. 2d 323, 80 S. Ct. 332 (1960). The Communications Act creates such an inference with respect to private parties seeking injunctive relief for violations of the Act. Section 401(a) permits injunctive relief for violations of the Telecommunications Act, but it does so only upon application by the Attorney General at the request of the FCC. See 47 U.S.C. 401(a);[12] see also New England Tel. & Tel. Co. v. Public Utils. Comm'n, 565 F. Supp. 949, 956 (D. Me. 1983) ("Section 401 reflects the Congressional mandate given the FCC; it does not empower private enforcement [of the Act]."); Peter W. Huber et al., Federal Telecommunications Law 3.14.3, at 318 (2d ed. 1999) ("A private party has no right to seek injunctive relief to enforce 'provisions' of the Communications Act. Section 401(a) reserves that authority to the Commission."). Under Sections 206 and 207, a private party can seek damages for violations of the Act, but it does not permit a party to seek injunctive relief. Finally, under Section 401(b), a remedy which plaintiffs abandoned here, private parties can seek injunctive relief only for FCC "orders." See ante note 11. The Communications Act, therefore, is not silent on the remedies available under that statute. Cf. Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 68, 117 L. Ed. 2d 208, 112 S. Ct. 1028 (1992) ("All appropriate relief is available in an action brought to vindicate a federal right when Congress has given no indication of its purpose with respect to remedies." (emphasis added)). Rather, it establishes a comprehensive scheme of remedies available under its provisions--a scheme that does not include a general right to seek private injunctive relief for violations of the Act.
 
 
 43
 The existence of these remedial provisions, in combination with the absence of any provision mentioning a general right to seek private injunctive relief for violations of the Act, clearly indicates that Congress did not intend to permit private parties to seek such relief for a violation of Section 222. See Transamerica Mortgage Advisors, 444 U.S. at 20 ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." (citation omitted)). This conclusion is "necessary and inescapable," especially because Congress provided for private injunctive relief for violations of other provisions of the Act. See, e.g., 47 U.S.C. 406 (providing for private injunctive relief where a party is prevented from "receiving service in interstate or foreign communication by wire or radio"); id. 274(e)(2) (providing for private injunctive relief where a Bell operating company violates the electronic publishing restrictions of 274).[13]
 
 
 44
 We therefore hold that the District Court properly rejected plaintiffs' request for injunctive relief. Plaintiffs abandoned any possible relief under Section 401(b) to enforce the FCC regulations at issue here, and they had no standing to request injunctive relief under the Communications Act for violations of Section 222(c). Accordingly, plaintiffs' request was properly denied.
 
 
 45
 We pause to note that, although plaintiffs were properly denied monetary and injunctive relief, they could have sought relief through a different avenue--specifically, by filing a complaint with the FCC. See id. 207 ("Any person claiming to be damaged by any common carrier . . . may make complaint to the [Federal Communications] Commission."); see also id. 208 ("No complaint [made to the FCC] shall at any time be dismissed because of the absence of direct damage to the complainant."). If the FCC had determined that AT&T had violated Section 222 or the two FCC regulations at issue here, the FCC could have sought or imposed a number of penalties for the violations. See, e.g., id. 401(a) (permitting the FCC to seek, through the Attorney General, injunctive relief for violations of the Act); id 503(b) (permitting the FCC to assess civil forfeitures and fines for violations of the Act and FCC regulations issued under the Act). Plaintiffs therefore had a forum in which to complain about the behavior alleged in their amended complaint, and to obtain relief if appropriate; however, they chose to seek relief elsewhere.
 
 D. The Fair Debt Collection Practices Act
 
 46
 Plaintiffs' next claim invokes the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 et seq. In their amended complaint, plaintiffs allege that "AT&T violated the FDCPA, 15 U.S.C. 1692e(11)[,] by mailing or causing to be mailed telephone bills to plaintiffs . . . without providing a clear warning that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose."
 
 
 47
 Section 1692e(11) of the FDCPA provides, in relevant part:
 
 
 48
 A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
 
 
 49
 . . . .
 
 
 50
 (11) The failure to disclose in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector . . . .
 
 
 51
 Id. 1692e(11) (emphasis added).
 
 
 52
 The District Court dismissed plaintiffs' claim on the ground that none of the plaintiffs qualified as a "consumer" under 1692e(11). See Conboy, 84 F. Supp. 2d at 504-05. According to the FDCPA, a "consumer" is "any natural person obligated or allegedly obligated to pay any debt." Id. 1692a(3). Plaintiffs admit that they were in no way obligated to pay the debt of their daughter-in-law, Maria. Accordingly, the District Court correctly concluded that they had no cause of action under 1962e(11).
 
 
 53
 Plaintiffs argue that their FDCPA claim should nonetheless survive because their amended complaint alleged that AT&T violated "the FDCPA in general." According to plaintiffs, their amended complaint should be read more broadly, to include other possible claims under the FDCPA that may be asserted by a person other than a "consumer."
 
 
 54
 We disagree. The amended complaint specifically refers to 15 U.S.C. 1692e(11) when invoking the FDCPA. Although the amended complaint makes a general statement that "AT&T's acts . . . violate the FDCPA," it does not point to any specific substantive provision of the FDCPA other than 1692e(11).[14] Plaintiffs even admit that, in the District Court, "whether the facts support claims under sections other than [ ] 1692e(11) of the FDCPA were [sic] not raised or briefed by the parties." Because plaintiffs gave no indication in the District Court that they were asserting a violation of FDCPA other than 1692e(11), and all parties proceeded on the assumption that the only violation claimed was under 1692e(11), we hold that all other claims under the statute were abandoned. See Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999) ("Having failed to make the present argument to the district court, plaintiff will not be heard to advance it here."). Accordingly, the District Court properly dismissed this cause of action.[15]
 
 E. State-Law Claims Against UCS
 
 55
 The next two issues involve state-law claims against UCS. Although these claims were also raised against AT&T, the District Court declined to exercise supplemental jurisdiction over them after it dismissed the federal claims against AT&T. Accordingly, we address them only as they relate to defendant UCS.
 
 1. New York General Business Law 349
 
 56
 The first issue involves New York General Business Law 349, which prohibits a creditor from engaging in "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law 349(a). Plaintiffs argue that UCS engaged in a "deceptive act" within the meaning of Section 349 by violating New York General Business Law 601, which prohibits a creditor from communicating with "the debtor or any member of his family or household with such frequency or at such unusual hours or in such a manner as can reasonably be expected to abuse or harass the debtor." Id. 601(6).
 
 
 57
 The District Court properly rejected this argument. The New York Court of Appeals has stated unequivocally that Section 601 does not supply a private cause of action. See Varela v. Investors Ins. Holding Corp., 81 N.Y.2d 958, 961, 598 N.Y.S.2d 761, 762, 615 N.E.2d 218 (1993) (explaining that Article 29-H of the General Business Law, which includes Section 601, "authorizes only the Attorney-General or a District Attorney to commence an action for violation of its provisions"). Plaintiffs cannot circumvent this result by claiming that a Section 601 violation is actionable under Section 349. As the District Court well explained:
 
 
 58
 Allowing plaintiffs to plead a cause of action under Section 601(6) by alleging that a violation of that statute necessarily constitutes a deceptive act under Section 349 appears contrary to the New York Legislature's intent and inconsistent with the statutory scheme. The Legislature, by creating a private right of action to enforce Section 349, clearly did not intend to authorize private enforcement of Section 601, especially where Section 601 contains its own enforcement provision which explicitly dictates who can enforce that section.
 
 
 59
 Conboy, 84 F. Supp. 2d at 506. In other words, plaintiffs cannot thwart legislative intent by couching a Section 601 claim as a Section 349 claim.
 
 
 60
 Plaintiffs also have failed to indicate how UCS's conduct was "deceptive" in any material way. Plaintiffs have not alleged any facts to suggest that UCS misled them; they also have not identified any statement made during any of UCS's telephone calls that was false or deceptive. As the District Court noted, "there is no indication that the telephone calls were for any purpose other than for what they purported to be." Conboy, 84 F. Supp. 2d at 506. Because a Section 349 violation requires a defendant to mislead the plaintiff in some material way, see Stutman v. Chemical Bank, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895, 731 N.E.2d 608 (2000), and plaintiffs have not alleged any type of deception here, the District Court correctly dismissed their claim under New York's General Business Law.
 
 
 61
 2. Intentional Infliction of Emotional Distress
 
 
 62
 Plaintiffs' second and final state-law claim is for intentional infliction of emotional distress. Plaintiffs allege that UCS committed this tort by calling them numerous times at unusual hours in the day "in such a manner as can reasonably be expected to abuse or harass" them. Under New York law, a claim of intentional infliction of emotional distress requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the jury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). The District Court held that plaintiffs failed to allege facts sufficient to satisfy the first requirement--extreme and outrageous conduct.
 
 
 63
 We agree. As New York's highest court has observed, the standard for stating a valid claim of intentional infliction of emotional distress is "rigorous, and difficult to satisfy." Howell v. New York Post Co., 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993) (citations omitted). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Stuto, 164 F.3d at 827 (quoting Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353). UCS's alleged conduct, even if accepted as true, simply does not rise to this level of outrageousness. Plaintiffs were not physically threatened, verbally abused, or publicly humiliated in any manner. See Stuto, 164 F.3d at 828. They were only harassed with numerous telephone calls from debt collectors. This conduct is not so outrageous as to "go beyond all possible bounds of decency" or to be regarded as "utterly intolerable in a civilized society." Id. at 827. Accordingly, we conclude that the District Court properly dismissed this claim.
 
 F. Leave to File Amendment
 
 64
 Plaintiffs' final argument on appeal is that the District Court erred in denying their request to file a second amended complaint to add a claim of conspiracy to violate the Telecommunications Act.
 
 
 65
 A district court's decision to grant or deny a leave to amend a complaint is reviewed for abuse of discretion, see Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993), and there was no such abuse of discretion here. The District Court properly held that plaintiffs failed to allege damages recoverable under the Telecommunications Act. Moreover, unlike the civil RICO statute, for example, which explicitly prohibits individuals from conspiring to violate its provisions, see 18 U.S.C. 1962(d), the Telecommunications Act does not expressly provide private parties with a cause of action for conspiracy to violate the Act. The District Court, therefore, was well within its discretion to deny plaintiffs' request to add this cause of action.
 
 III. Conclusion
 
 66
 We note again that the Communications Act provided a remedy for the conduct which plaintiffs allege here. Specifically, plaintiffs were permitted to file a complaint with the FCC, which, in turn, could have sought and imposed a number of penalties for violations of the Telecommunications Act and regulations promulgated thereunder. Plaintiffs chose not to pursue this administrative remedy, electing instead to seek relief in the federal courts. For the reasons stated above, however, we hold that:
 
 
 67
 (1) plaintiffs failed to allege recoverable damages under Sections 206 and 207 of the Communications Act and, therefore, could not maintain a cause of action for alleged violations of Section 222 of the Telecommunications Act;
 
 
 68
 (2) plaintiffs, as private parties, have no right of action for monetary damages for alleged violations of 47 C.F.R. 51.217(c)(3)(iii) and 64.1201(c)(2);
 
 
 69
 (3) plaintiffs cannot seek injunctive relief for alleged violations of Section 222 of the Act and 47 C.F.R. 51.217(c)(3)(iii) and 64.1201(c)(2);
 
 
 70
 (4) plaintiffs are not "consumers" within the meaning of Section 1692e(11) of the FDCPA and therefore cannot recover under this provision of the statute--the only one explicitly raised in their amended complaint;
 
 
 71
 (5) plaintiffs failed to allege "deceptive" conduct to support their claim against UCS under New York General Business Law 349;
 
 
 72
 (6) plaintiffs did not allege the extreme and outrageous conduct necessary to assert a claim of intentional infliction of emotional distress against UCS; and
 
 
 73
 (7) the District Court did not abuse its discretion in denying plaintiffs' request to amend their complaint for a second time to add a charge of conspiracy to violate the Telecommunications Act.
 
 
 74
 The judgment of the District Court is hereby affirmed.
 
 
 
 Notes:
 
 
 [1]
 According to the plaintiffs' amended complaint, UCS was a subsidiary or affiliate of AT&T until April 2, 1998, when AT&T transferred UCS to Citicorp, an entity unaffiliated with AT&T.
 
 
 [2]
 CPNI is defined as:
 (A) information that relates to the quantity, technical configuration, type destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and
 (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier . . . .
 47 U.S.C. 222(h)(1) (Supp. 2000) (italics indicate 1999 amendment).
 CPNI does not include, however, any information:
 (A) identifying the listed names of subscribers of a carrier and such subscribers' telephone numbers, addresses, or primary advertising classifications (as such classifications are assigned at the time of the establishment of such service), or any combination of such listed names, numbers, addresses, or classifications; and
 (B) that the carrier or an affiliate has published, caused to be published, or accepted for publication in any directory format.
 Id. 222(h)(3).
 The word "location" was added to the definition of CPNI in October 1999, see Wireless Communications and Public Safety Act of 1999, Pub. L. No. 106-81, 5(3), 113 Stat. 1286, 1289 (1999), over a year after plaintiffs were allegedly harassed. The 1999 amendment does not affect this appeal.
 
 
 [3]
 Section 222(c)(1) of the Telecommunications Act governs the proper use of CPNI and provides:
 Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit, access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.
 47 U.S.C. 222(c)(1) (Supp. 2000).
 
 
 [4]
 Section 206 provides individuals with a private right of action for violations of the Telecommunications Act. It states in relevant part:
 In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter . . . .
 47 U.S.C. 206 (1994).
 
 
 [5]
 Section 207 provides:
 Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the [Federal Communications] Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both remedies.
 47 U.S.C. 207 (1994).
 
 
 [6]
 Under the doctrine of "presumed damages," a court will assume that a plaintiff has alleged damages even though he cannot specifically prove such damages. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 310-11, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986). Such damages are generally available only where "a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish." Id. In such circumstances, "presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure." Id. at 311.
 
 
 [7]
 This interpretation of the Telecommunications Act is entitled to deference under the doctrine of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)
 
 
 [8]
 The Supreme Court has found such circumstances only in a few limited situations, such as in the common law of defamation per se. See Carey, 435 U.S. at 262. In general, the Supreme Court has declined to permit recovery of such damages under federal law. See, e.g., Stachura, 477 U.S. at 307 (holding that a violation of First Amendment rights does not give rise to presumed damages under 42 U.S.C. 1983); Carey, 435 U.S. at 263-64 (holding that a violation of procedural due process does not give rise to presumed damages under 42 U.S.C. 1983).
 
 
 [9]
 47 C.F.R. 51.217(c)(3)(iii) was amended in 1999 and now appears at 47 C.F.R. 51.217(c)(3)(iv). The amended Section provides:
 Unlisted numbers. A [local-exchange carrier] shall not provide access to unlisted telephone numbers, or other information that its customer has asked the [local-exchange carrier] not to make available, with the exception of customer name and address. The [local-exchange carrier] shall ensure that access is permitted to the same directory information, including customer name and address, that is available to its own directory assistance customers.
 (Italics indicate amendment). The 1999 amendment does not affect this appeal.
 This Section falls within a larger provision requiring local-exchange carriers to provide a competing provider with access to their directory-assistance databases. See 47 C.F.R. 51.217 (2000). According to the regulations, a competing provider must have access to these databases so that "any customer of a competing provider can obtain directory listings . . . notwithstanding the identity" of his local provider. Id. 51.217(c)(3)(i). Under 47 C.F.R. 51.217(c)(3)(iv), however, such access does not include unlisted telephone numbers. Plaintiffs argue that AT&T violated 51.217(c)(3)(iv) by providing access to their unlisted telephone number to entities such as UCS.
 
 
 [10]
 47 C.F.R. 64.1201(c)(2), which restricts the disclosure of billing names and addresses, provides:
 In no case shall any telecommunications service provider or authorized billing and collection agent of a telecommunications service provider disclose the billing name and address information of any subscriber to any third party, except that a telecommunications service provider may disclose billing name and address information to its authorized billing and collection agent.
 
 
 [11]
 47 U.S.C. 401(b) provides, in relevant part:
 If any person fails or neglects to obey any order of the [Federal Communications] Commission other than for the payment of money, while the same is in effect, the [Federal Communications] Commission or any party injured thereby . . . may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction . . . .
 (Emphasis added).
 We do not address the issue of whether an FCC regulation constitutes an FCC "order" for purposes of this statutory provision, compare Hawaiian Tel. Co. v. Public Utils. Comm'n, 827 F.2d 1264, 1270-72 (9th Cir. 1987) (holding that an FCC regulation is an "order"), with New England Tel. & Tel. Co. v. Public Utils. Comm'n, 742 F.2d 1, 6 (1st Cir. 1984) (holding that an FCC regulation is not an "order"), because, even if we assume that a regulation is an "order," plaintiffs in the instant case have no private right of action for money damages.
 
 
 [12]
 Section 401(a) provides:
 The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the [Federal Communications] Commission, alleging a failure to comply with or a violation of any of the provisions of this chapter by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this chapter.
 
 
 [13]
 Plaintiffs draw to our attention only one unpublished case by a Court of Appeals that directly suggests that private injunctive relief is available under the Telecommunications Act-- AT&T Communications, Inc. v. Pacific Bell, 1997 U.S. App. LEXIS 5091, No. 96-16476 (9th Cir. Mar. 14, 1997). In that case, a district court issued a preliminary injunction to prevent Pacific Bell from using and disclosing, for purposes of an awards program, the long-distance billing information they received from plaintiffs AT&T, MCI, and Sprint. See id. at *2. The Ninth Circuit affirmed the grant of the injunction, because the "use and disclosure of the billing information for the awards program appeared to breach the terms of the billing agreements between plaintiffs and Pacific Bell." Id. at *3. In dicta, the Ninth Circuit added: "This activity may well also violate the Telecommunications Act and constitute a misappropriation of trade secrets." Id. Plaintiffs seek to rely on this tentative, oblique dicta from an unpublished opinion to argue that the Telecommunications Act permits private parties to seek injunctive relief in a district court for violations of Section 222.
 We find plaintiffs' argument unconvincing. First, the Ninth Circuit case refers to the Telecommunications Act only in passing; it does not purport to stand for the proposition that private injunctive relief is available for a violation of Section 222 of the Telecommunications Act. Second, because the opinion is an unpublished disposition, it is not binding even in the Ninth Circuit, let alone here. See 9th Cir. R. 36-3(a) ("Unpublished dispositions and orders of this Court are not binding precedent, except when relevant under the doctrine of law of the case, res judicata, or collateral estoppel."). Third, plaintiffs' very citation of the opinion, even for persuasive support, is a violation of the Ninth Circuit's rules. See id. 36-3(b) ("Unpublished dispositions and orders of this Court may not be cited to . . . ."); cf. 2nd Cir. R. 0.23 ("Since [unpublished summary orders] do not constitute formal opinions of the court and are unreported or not uniformly available to all parties, they shall not be cited or otherwise used in unrelated cases before this or any other court.").
 
 
 [14]
 The amended complaint cites 15 U.S.C. 1692(a) with respect to the FDCPA claim, but this provision is simply a statement of Congressional findings that motivated the passage of the FDCPA; it does not confer any substantive rights under that statute.
 
 
 [15]
 We decline to reach the issue of whether the District Court erred in holding that AT&T is a "debt collector" within the meaning of 1692e(11), since resolution of the issue is unnecessary for purposes of this appeal.